FARMERS' LOAN & TRUST CO. v. CITY OF SIOUX FALLS et al.

(Circuit Court, D. South Dakota, S. D. July 11, 1904.)

1. MUNICIPAL CORPORATIONS—GRANT OF WATERWORKS FRANCHISE—IMPLIED CONTRACT.

The granting of a franchise by a city to a water company to construct and maintain waterworks to supply water for public use does not raise an implied contract that the city will not itself construct and maintain a waterworks system in competition with that of the grantee.

2. SAME—CONSTRUCTION OF GRANT—COMPETITION BY CITY.

Where a city having power to grant a franchise to a water company to occupy its streets, but not to grant a perpetual exclusive right, entered into a contract which purported to grant the exclusive privilege of laying and maintaining water pipes in its streets, and by which it agreed to pay certain rentals for hydrants, such contract to continue in force for 20 years, such contract and grant did not, either expressly or by implication, prevent the city from constructing and operating waterworks of its own after the expiration of the 20 years, provided it has the constitutional and statutory power to do so, and the water company would be without remedy for any damage resulting to it from the competition so created. If, however, the city has no such power, the company was justified in investing its money in reliance thereon, and is entitled to an injunction restraining it from constructing competing works, which will result in irreparable loss and damage to its own property, and for which its property will be taxed.

3. MORTGAGE—RIGHTS OF MORTGAGEE—SUIT TO ENJOIN INJURY TO MORTGAGED PROPERTY.

The mortgagee of a water company has such an interest in the property of the company pledged as security as entitles it to maintain a suit to enjoin the city from constructing and maintaining a rival water system, the effect of which will be to cause irreparable damage to such security, on the ground that the city has no constitutional or statutory power to build such works.

4. MUNICIPAL CORPORATIONS—POWER TO CONSTRUCT WATERWORKS—CONSTITU-
TIONAL LIMIT OF INDEBTEDNESS.

Const. S. D. art. 13, § 4, as originally adopted, provided that "the debt
of any county, city, town, school district or other subdivision shall never
exceed five per centum upon the assessed value of the taxable property
therein," the debts then existing to be included in computing the amount
of legal indebtedness. By subsequent amendments, the last of which was
adopted in 1902, a proviso was added allowing counties, etc., to incur "an
additional indebtedness, not exceeding ten per centum" upon the assessed
valuation of the taxable property therein for the year preceding that in
which the indebtedness was incurred, for the purpose of providing water
for irrigation or domestic uses. *Held*, that the indebtedness authorized
by the amendment was "additional" to the 5 per centum to which the
indebtedness for general purposes was limited, and not additional to its
existing indebtedness, whatever its amount might be; and that a city al-
ready indebted to an amount nearly equal to 15 per cent. of the assessed
value of the property therein for the preceding year had no power to
construct waterworks by an issue of bonds which would increase its in-
debtedness to 23 per cent. of its assessed valuation.

5. FEDERAL COURTS—FOLLOWING STATE DECISIONS.

Where rights involved in a suit in a federal court were acquired on the
faith of a constitutional or statutory provision of a state, the court is not
bound by a construction subsequently placed on such provision by the
highest court of the state, but is required to exercise its own independent
judgment as to such construction.

6. MUNICIPAL CORPORATIONS—CONSTRUCTION OF WATERWORKS—LEGALITY OF
INDEBTEDNESS.

Const. S. D. art. 13, § 4, was amended in 1902 by adding a proviso that
the additional 10 per cent. of indebtedness which a county or municipality
was thereby authorized to incur for water purposes should be based on the
assessed value of the property therein for the preceding year, whereas
previously the assessment of no particular year was specified. It also
provided that no such indebtedness should be incurred unless authorized
by a vote in favor thereof by a majority of the electors of such county or
municipality. *Held*, that a city had no authority to issue bonds there-
under for waterworks on a vote taken before its adoption, under a statute
providing that a majority of the electors should be determined by the vote
for mayor at the last preceding city election, but that, in order to create a
valid indebtedness, an election must have been held after the adoption of
the amendment, and in strict accordance with its provisions.

7. SAME—VALIDITY OF ELECTION TO AUTHORIZE BONDS—COUPLING ALTERNA-
TIVE PROPOSITIONS TOGETHER.

Sess. Laws S. D. 1899, p. 62, c. 53, §§ 1, 2, which grant the power to
cities of the first class on the vote of the electors thereof to issue bonds
"for the purpose of constructing, equipping, maintaining, and operating
or purchasing a system of waterworks," do not authorize the submission
of the question of issuing bonds for the purpose of "constructing  *  *  *
or purchasing" a system of waterworks; and a vote on the question so
submitted confers no power to issue the bonds, since a voter is given no
choice between the two propositions, but is compelled to vote for or
against both.

In Equity. Suit for injunction. On final hearing.

The original bill in this case was filed on November 30, 1901, by the Farmers'
Loan & Trust Company, a corporation of the state of New York, against the

¶ 4. Constitutional and statutory limitations of municipal indebtedness, see
note to City of Helena v. Mills, 36 C. C. A. 6.

¶ 5. State laws as rules of decision in federal courts, see notes to Griffin v.
Overman Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v.
Hite, 29 C. C. A. 553.

See Courts, vol. 13, Cent. Dig. § 957.

city of Sioux Falls, S. D., George W. Burnside, mayor, E. G. Ledyard, auditor, John Olson, treasurer, and H. N. Gates, John Mallanney, Thomas S. Roberts, Jonah Jones, J. M. Neil, F. A. Marvin, Iver L. Bratager, J. M. O'Neill, Alexander Reid, W. H. Ramsey, Thomas J. Bushell, and David Park, aldermen, of said city, all being citizens and residents of the state of South Dakota, and W. S. Kuhn, a citizen of the state of Pennsylvania, and Sioux Falls Water Company and South Dakota Water Company, corporations of the state of South Dakota. The bill was filed by the Farmers' Loan & Trust Company for the purpose of restraining the city of Sioux Falls from proceeding to construct and establish a system of waterworks in said city, to be operated and maintained by said city for the purpose of supplying water to itself and its inhabitants, for the reason that the construction and operation of such a system of waterworks would impair, if not wholly destroy, the revenues which were being earned by the South Dakota Water Company in furnishing the city of Sioux Falls and its inhabitants with water under and in pursuance of the contract between the city of Sioux Falls and W. S. Kuhn, hereinafter referred to. The South Dakota Water Company, Sioux Falls Water Company, and W. S. Kuhn answered the original bill, and also filed a cross-bill against their codefendants and the complainant, the Farmers' Loan & Trust Company. The city of Sioux Falls and the remaining defendants demurred to the original bill and to the cross-bill. The demurrers were subsequently argued, and, by the court, overruled, for the reason that the city of Sioux Falls had no right or authority, during the existence of the contract hereinafter mentioned, to establish a system of waterworks to furnish water to itself and its inhabitants, in competition with the South Dakota Water Company. The city and the other demurring defendants then answered the original bill and cross-bill. No further proceeding was had in the case until October 16, 1903, when an amended and supplemental cross-bill was, by leave of court, filed by the South Dakota Water Company, W. S. Kuhn, and the Sioux Falls Water Company, making defendants the same parties who were the defendants in the original cross-bill. The Farmers' Loan & Trust Company answered the original cross-bill and also the amended and supplemental cross-bill. The city of Sioux Falls, and the same defendants who demurred to the original bill and to the original cross-bill, again demurred to the amended and supplemental cross-bill. This demurrer came on for argument, and, by the court, was overruled. At the same time that the demurrer to the amended and supplemental cross-bill was argued a motion for a temporary injunction, based upon all the pleadings in the case, was made and heard, and at the time of overruling the demurrer to the amended and supplemental cross-bill this court granted a temporary writ of injunction restraining the defendant the city of Sioux Falls from proceeding any further in the construction of a system of waterworks for the purpose of supplying itself and its inhabitants with water, and to be constructed and maintained by the taxation of the citizens thereof. As a condition of granting said temporary writ of injunction the court required the South Dakota Water Company to execute a bond in the sum of $200,000, conditioned to pay all damages which might arise by reason of the granting of said temporary writ. At the time of making the motion for the temporary writ, the South Dakota Water Company made an offer to the effect that, in case either the city or itself was successful in this litigation, it would take the plant or system of waterworks, so far as it had been constructed by the city, from the city at its actual cost, and the bond given upon the granting of said temporary writ also is conditioned for the faithful performance of this offer, and the granting of the writ was conditional both as to the execution of the bond and the performance of this offer. Upon the overruling of the demurrer the city and the demurring defendants answered the amended and supplemental cross-bill, and the case, after testimony had been taken, came on for hearing upon the merits.

The facts established by the pleadings and proof, so far as they are material to the decision arrived at in this case, are as follows: On April 9, 1884, the city of Sioux Falls, then being a municipal corporation acting under a special charter granted by the Legislature of the territory of Dakota, entered into a contract with one W. S. Kuhn, of the city of Pittsburg, Pa., and his associates, successors, and assigns, for the purpose of obtaining a supply of

water for the city of Sioux Falls and its inhabitants. In the first part of said contract is found the following language:

"That said party of the first part has granted to the said party of the second part the exclusive privilege of laying water pipes for public use beneath the surface of the highways of said city, with all necessary facilities and privileges for laying water pipes for public use beneath the surface of the highways of said city, with all necessary facilities and privileges for laying and repairing said water pipes from time to time as same may become necessary."

In consideration of this privilege, W. S. Kuhn, his associates, successors, and assigns, agreed to construct within the city of Sioux Falls a system of waterworks sufficient to supply a constant and sufficient supply of pure water to every citizen in said city requiring it for ordinary house use, upon condition of such citizen or citizens paying to said W. S. Kuhn, his associates, successors, and assigns, quarterly, in advance, of the usual charges for water privileges at rates not exceeding those at present charged in Kansas City, Mo., Council Bluffs, Iowa, Quincy, Ill., and Lincoln, Neb. Said Kuhn further agreed to erect at once on the line of the water pipes to be placed in the streets of said city, and maintain in good repair, 40 fire hydrants of the kind known as "double delivery," to have a certain capacity specified in the contract; the city by said contract agreeing to pay to said Kuhn, his associates, successors, and assigns, the annual sum of $3,000, in quarterly installments, for the water to be supplied from said hydrants for fire protection and other public purposes. And said contract further provided that said W. S. Kuhn, his associates, successors, and assigns, should, whenever required by the city, furnish additional hydrants, and this has been done up to the number of 117. And said W. S. Kuhn further agreed to extend at any time the original pipe line of said system of waterworks, when so required by the party of the first part. Paragraph 9 of said contract is in the following language:

"It is further understood and agreed by the parties to this contract that the same shall continue in full force and effect for and during the period of twenty years from April 9, 1884, with the privilege for the party of the first part to purchase this waterworks from party of the second part, his successors or assigns, on the expiration of ten years, by appraisement by disinterested parties of three persons, one elected by the party of the first part, another by the party of the second part, and a third chosen by the two thus named, and if not purchased then, the same privilege is granted at each successive five years."

W. S. Kuhn, his associates, successors, and assigns, so far as this record is concerned, have complied with all the obligations of said contract on their part, and the city has received its supply of water for public purposes and for the use of the inhabitants of said city from said company; said system of waterworks having been enlarged from time to time during the 20 years since April 9, 1884, until it now represents an expenditure of some $481,000; said enlargements of the water system being required by the growth of the city of Sioux Falls and by the request of the city council of said city from time to time. Said system of waterworks has been largely extended. The Farmers' Loan & Trust Company is a corporation of the state of New York, authorized to become trustee in mortgages or deeds of trust. The Sioux Falls Water Company is a corporation organized in the year 1884 under and by virtue of the laws of the territory of Dakota for the purpose, among other things, of constructing and operating waterworks in and adjacent to the city of Sioux Falls, for the purpose of supplying water for municipal, fire, domestic, and other purposes within the limits of said city and other territory adjacent thereto. The South Dakota Water Company was originally incorporated and organized under the laws of the state of South Dakota on the 28th day of June, 1890, for the purpose of acquiring, purchasing, constructing, and operating waterworks in and adjacent to the city of Sioux Falls, and other cities, towns, and villages in the state of South Dakota, for the purpose of supplying water for fire, domestic, and other purposes, and to acquire, purchase, hold, and pledge any franchises, rights, and properties of any waterworks or water companies in said state; also to acquire, purchase, and hold such real estate as its legitimate purposes might require, and to transfer, sell, and convey any and all property owned by it, and to borrow money, issue bonds,

notes, and other obligations, and to secure the same by mortgage upon any and all rights then owned or thereafter acquired by it. On or about the 22d day of July, 1885, the said W. S. Kuhn, by assignment in writing, duly sold, assigned, transferred, and conveyed to the Sioux Falls Water Company all his right, title, and interest in and to and under said agreement entered into with the said city. On or about the 30th day of June, 1890, the said Sioux Falls Water Company duly granted, bargained, sold, and conveyed to the defendant the South Dakota Water Company all the property, lands, and franchises, including its waterworks plant, in and adjacent to the city of Sioux Falls, and all its rights, privileges, powers, and immunities under and by virtue of said agreement made between the said Kuhn and the said city of Sioux Falls, and that the said South Dakota Water Company has been, since the date of that assignment, and still is, in the possession and enjoyment of said property, waterworks, and franchises as the owner thereof. That on the 1st day of July, 1890, the South Dakota Water Company was indebted in a large sum of money for the purchase price of said waterworks, real estate, property, franchises, and improvements theretofore purchased by said South Dakota Water Company from the Sioux Falls Water Company, and for the purpose of paying said debt and for providing for future extensions, betterments, and improvements, and also for the purpose of exchanging and retiring $60,000 outstanding first mortgage bonds of the Sioux Falls Water Company of date July 1, 1884, which were a first lien upon said waterworks and franchises; and in order to meet the requirements and necessities of the city of Sioux Falls and its inhabitants, under the terms of said agreement aforesaid, said South Dakota Water Company on said date executed to the Farmers' Loan & Trust Company three hundred bonds, numbered consecutively from 1 to 300, inclusive, each of the denomination of $1,000, aggregating $300,000, and payable by the terms thereof in lawful money of the United States at the office of the Farmers' Loan & Trust Company in the city of New York on July 1, 1910, with interest from the date thereof at the rate of 6 per cent. per annum, payable on the 1st days of January and July in each year. That for the purpose of securing the payment of the said bonds the said South Dakota Water Company on said July 1, 1890, executed and delivered to the said Farmers' Loan & Trust Company its mortgage deed, or deed of trust, wherein and whereby it did grant, bargain, sell, and assign, set over, transfer, alien, release, convey, and confirm to the said Farmers' Loan & Trust Company, its successor and successors in the trust thereby created, all and singular its waterworks hereinafter mentioned, situated in and near the city of Sioux Falls, in Minnehaha county and state of South Dakota, together with all lands, rights, and interests in lands, machinery, outfits, pipes, pipe lines, reservoirs, hydrants, rights, privileges, and franchises, and any and all property or estate, personal, real, or mixed, then or now owned or which might thereafter be acquired by the said South Dakota Water Company, with all tenements, hereditaments, and appurtenances to any of the same belonging, and all revenues, rents, incomes, and privileges from any of the same or from any other source arising or coming, and also all deeds, mortgages, leases, contracts, and all muniments of title to any real or personal property in the state; and for further assurance it was provided in said deed of trust that all rights of action thereafter should be vested exclusively in said Farmers' Loan & Trust Company as such trustee. That in and by said mortgage the Farmers' Loan & Trust Company acquired, and ever since has had, and still has, an estate in and a lien upon all property, real, personal, and mixed, of the said South Dakota Water Company and its revenues, to secure and insure the payment of all of said bonds with the coupons thereto attached. That in and by the terms of said mortgage or deed of trust said South Dakota Water Company covenanted and agreed that, in addition to the payment of interest, and in order to provide a fund for the payment and retirement of the principal of said bonds, it, the said South Dakota Water Company, would, beginning with its receipts on the 1st day of July, 1895, and continuing during the existence of the lien of the mortgage debt, pay over to the said trustee on the 1st days of July and January in each and every year an amount equal to 10 per centum of the net income after satisfying the interest requirements of the said bonds of the Sioux Falls Water Company of

July 1, 1884. That the Farmers' Loan & Trust Company, as trustee, should use the said fund in redeeming the said bonds. The said South Dakota Water Company further, in and by said mortgage or deed of trust, transferred and set over to the Farmers' Loan & Trust Company and its successors all its claims and demands against the city of Sioux Falls not used for the payment of interest as provided in said mortgage of Sioux Falls Water Company of July 1, 1884, during the existence of any part of the mortgage debt so secured by said conveyance for the use of fire hydrants and other public purposes by virtue of the contracts of said South Dakota Water Company with the city of Sioux Falls. That the water rentals payable by the city of Sioux Falls under the contract thereinbefore referred to are necessary and essential to pay the principal and interest upon the bonds secured by the deed of trust hereinbefore referred to. Under the provisions of the said deed of trust $290,000 of the said bonds have been negotiated and sold and delivered for the purposes aforesaid, and are now outstanding and unpaid, and are in the hands of divers and sundry persons and corporations; and that this suit is brought by the Farmers' Loan & Trust Company, as it believes it to be its duty to protect said securities in behalf of the holders of said bonds. That the total revenues inuring to the South Dakota Water Company under and by virtue of the contract made with Kuhn amounts annually to about the sum of $23,404. That the only means of paying the bonds and interest thereon, hereinbefore referred to, are the revenues received from the city of Sioux Falls and its inhabitants for supplying water. That the South Dakota Water Company, in addition to the system of waterworks hereinbefore described, is the owner of real estate in said city, which was assessed for the year 1901 at the sum of $1,725, for the year 1902 $1,755, and for the year 1903 $1,571; and that the assessed valuation of the personal property of said South Dakota Water Company in said city of Sioux Falls for the year 1901 was $37,500, for the year 1902 $86,000, and for the year 1903 $90,000; making an aggregate assessed valuation of real and personal property for the year 1903 of $91,871. That the annual taxes upon said real and personal property for the year 1901 were $2,087, for the year 1902 $4,861, and for the year 1903 the sum of $4,244; the total levy for all purposes for the year 1903 being 46.2 mills on the dollar. That in the month of October, 1901, the mayor and city council of the said city of Sioux Falls passed an ordinance in the following language:

"An ordinance declaring it necessary to call a special election for the purpose of submitting to the legal voters of the city of Sioux Falls the question whether bonds shall be issued for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks and the mode of conducting the same.

"Be it resolved by the city council of the city of Sioux Falls:

"Section 1. That a special election be held on Tuesday November 5, A. D., 1901, for the purpose of submitting to the legal voters of the city of Sioux Falls, South Dakota, the question whether the said city of Sioux Falls shall issue its bonds to the amount of $210,000 for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks for the use and benefit of said city for providing water for domestic uses.

"Sec. 2. The question submitted to the legal voters of said city as provided in section 1 shall be as follows: Shall the city of Sioux Falls issue its bonds to the amount of $210,000 for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks for the uses and purposes of said city and for providing water for domestic uses?

"Sec. 3. Said election shall be conducted and the ballots therefor prepared and the voting for or against said proposition shall be in the same manner as in the case of regular annual elections in said city, and the votes shall be canvassed and counted and the result declared in the same manner as for said election so held at the regular annual election in said city and all rules and regulations prescribed by statute relative to the manner of voting and declaring the result and canvassing the vote shall be in the same manner as prescribed by statute in the case of regular annual election.

"Sec. 4. This ordinance shall be in force and take effect from and after its approval and publication."

And in connection with said ordinance, on October 15, 1901, passed the following resolution:.

"Be it resolved by the city council of the city of Sioux Falls:

"That a special election be held on the fifth (5) day of November, A. D. 1901, for the purpose of submitting to the legal voters of the city of Sioux Falls, South Dakota, the question whether the said city of Sioux Falls shall issue its bonds for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks to provide water for domestic uses.

"Also resolved, that the amount of bonds to be issued shall be two hundred and ten thousand ($210,000) dollars to run twenty (20) years from the date of their issuance, and shall bear interest not to exceed five per cent. per annum, and the purpose for which said bonds are to be issued is to construct, equip, maintain and operate or purchase a system of waterworks to provide water for domestic uses.

"Also resolved, that the question to be submitted at said special election and the ballots to be voted at said special election shall read as follows:

" 'In favor of the proposition of issuing bonds to the extent of two hundred and ten thousand ($210,000) dollars for the purpose of providing water for domestic uses.'

" 'Against the proposition of issuing bonds to the extent of two hundred and ten thousand ($210,000) dollars for the purpose of providing water for domestic uses.'

"Also resolved, that said special election shall be conducted and the votes cast thereat shall be counted, returned and canvassed in such manner as is now provided by law in the case of regular annual elections."

And in pursuance of said resolution the notice of special election was given, which, so far as is material to the decision of this case, was as follows:

"Be it resolved by the city council of the city of Sioux Falls:

"That notice is hereby given that a special election will be held on Tuesday, November 6th, A. D. 1901, for the purpose of submitting to the legal voters of the city of Sioux Falls, South Dakota, the question whether the said city of Sioux Falls shall issue its bonds to the amount of two hundred and ten thousand ($210,000) dollars to run twenty (20) years from the date of their issuance and to bear interest not to exceed five (5) per cent per annum, said bonds to be issued for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks to provide water for domestic uses.

"The question to be submitted at said special election and the ballots to be voted at said special election shall be as follows:

" 'In favor of the proposition of issuing bonds to the extent of two hundred and ten thousand ($210,000) dollars for the purpose of providing water for domestic uses.'

" 'Against the proposition of issuing bonds to the extent of two hundred and ten thousand ($210,000) dollars for the purpose of providing water for domestic uses.' "

In pursuance of said ordinance, resolution, and notice of special election, a special election, which it is claimed authorized the issuance of the said $210,000 of bonds mentioned in said ordinance and resolution, was held. In the summer of 1903, $210,000 of the bonds of said city were issued and sold, and the city has received the sum of $182,300 as the proceeds of said bonds, and has expended in the construction of the proposed water plant for itself about the sum of $150,000. That the assessed valuation of property subject to taxation in the city of Sioux Falls for the year 1901 was $2,510,671, for the year 1902 $2,739,598, and for the year 1903 $3,481,988. That the indebtedness of the city of Sioux Falls in the year 1903 and at the time the said $210,000 of bonds were issued by said city was $391,000. That the indebtedness of the city of Sioux Falls in the year 1903 and at the time the bonds hereinbefore referred to were issued, based upon the assessed value of the property of said city for the year 1903, was between 14 and 15 per cent. That the addition to said indebtedness of the sum of $210,000 would make the indebtedness of the city of Sioux Falls, figuring on the same assessed valuation, over 21 per cent.

Davis, Lyon & Gates, for complainant Farmers' Loan & Trust Co.

Bartlett Tripp (Bailey & Voorhees, of counsel), for cross-complainant South Dakota Water Co.

H. H. Keith (R. H. Warren, of counsel), for defendants.

Before SANBORN, Circuit Judge, and CARLAND, District Judge.

CARLAND, District Judge, after stating the case as above, delivered the opinion of the court.

In this opinion the Farmers' Loan & Trust Company will be called "complainant," the South Dakota Water Company "water company," and the city of Sioux Falls "the city."

Upon this record the complainant and the water company insist that the city must be enjoined from proceeding further in the construction and operation of a system of waterworks of its own for supplying itself and the citizens of said city with water for public and domestic uses in competition with the defendant water company, the complainant and defendant water company claiming that the construction and operation by the city of a system of waterworks, to be supported by taxation, would absolutely ruin the plant and revenues of the water company, in which the complainant and the water company are interested, the water company as owner and the complainant as trustee for the holders of bonds issued under the trust deed executed to it by the water company upon the property, franchises, rentals, and income of the water company. The evidence conclusively established that the construction and operation of a system of waterworks by the city will inflict grave, nay, irreparable, injury upon the complainant and upon the water company. It will institute a ruinous competition between their business and that of the city, and will impose a tax upon their property, so that the security of the complainant and the value of the property of the water company will be practically destroyed. The complainant and the water company are therefore entitled to the relief which they seek, unless the city has the right, under the Constitution and the statutes of the state, to inflict this serious damage. Every one has a right to the fruits and advantages of his property, skill, and industry, and to its protection against every injury not justified by the law. Damages inflicted by authority of law are, indeed, a part of that great mass of wrongs termed "damnum absque injuria," for which neither law nor equity furnishes a remedy. But damages inflicted without the authority or in violation of the law are never remediless. The threatened injury in the case at bar is not debatable. The only question is whether or not its infliction is justified by the law. The complainant and the water company insist that it is without justification, (1) because the city is not authorized to inflict, but is prohibited from inflicting, it, by the Constitution and the statutes of the state of South Dakota, which forbid it to construct and maintain its waterworks; and (2) because it agreed by the contract of April 9, 1884, that it would not do so, and that Kuhn and his associates should have the exclusive privilege of constructing and maintaining such

131 F.—57

works in the city of Sioux Falls. If either of these propositions is tenable, the complainant and the water company are manifestly entitled to an injunction. In the discussion of these propositions the right of the water company and of the complainant to a perpetual injunction by virtue of the contract will first be considered. In the discussion of this right the assumption will be indulged that under the constitution and laws of the state the city is authorized to construct and maintain its own waterworks, and the question presented by that proposition will be later considered. All that is said in the consideration and determination of the question whether the contract entitles to relief is based upon this assumption.

In the view of this case which the court has been compelled to adopt, it is unnecessary to consider or decide whether or not the privilege to lay and operate the water mains granted to Kuhn and his assigns continued after the expiration of the 20 years specified in the contract, because the city has neither taken nor threatened any action inconsistent with this continuance. When, if ever, it attempts to prevent the exercise of this privilege, it will be time enough to consider its duration. The material question which the contract now presents is whether the grant of the "exclusive privilege" contained in it estops the city, if otherwise lawfully authorized to do so, from constructing, completing, and maintaining its own waterworks. It is conceded by counsel for the complainant and the water company that the word "exclusive" in the contract between the city and Kuhn, if construed to exclude every person perpetually, would be void as against public policy; but that the word "exclusive" must be construed as having the effect of an agreement on the part of the city not to construct and maintain a system of waterworks in the city of Sioux Falls in competition with the water company. As bearing upon the complainant's and water company's claim based upon or arising out of the contract of April 9, 1884, we believe that the following propositions are sound:

First. The city of Sioux Falls, on April 9, 1884, had no power to grant to W. S. Kuhn a perpetual exclusive franchise or privilege for laying water pipes for public use beneath the surface of the highways of said city. Authorities in support of this proposition need not be cited, as counsel for complainant and the water company, at the argument, conceded its correctness.

Second. On April 9, 1884, the city of Sioux Falls had the power to grant the privilege to W. S. Kuhn to lay water pipes for public use beneath the surface of the highways of said city for a reasonable time. This proposition needs no discussion in view of the fact that for 20 years the city and the water company have performed their several obligations under the contract referred to.

Third. The city had the power by an express contract to renounce its authority to construct and maintain waterworks itself during the time which it would be proper and lawful to grant the privilege to a third party. Walla Walla City v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341.

Fourth. The grant of the privilege by the city to W. S. Kuhn to lay water pipes beneath the surface of the highways of said city for

public use did not imply that the city would not itself construct and maintain a rival waterworks system. Skaneateles Waterworks Co. v. Skaneateles, 184 U. S. 354, 22 Sup. Ct. 400, 46 L. Ed. 585; City of Joplin v. S. W. Missouri Light Co., 191 U. S. 150, 24 Sup. Ct. 43, 48 L. Ed. 127.

Fifth. The word "exclusive" in the contract between the city and W. S. Kuhn is insufficient to raise the implication that the city, by the use of said word, thereby agreed to renounce its power to construct waterworks itself, because (1) such is not the ordinary meaning of the word; (2) because it is conceded that under the law the word "exclusive," if given its usual interpretation, would render the exclusive feature of the contract void; (3) because the express provision of the contract of the city to take water for a term of 20 years raises the contrary implication that, after the expiration of that 20 years, both parties intended that the city should be free to exercise its power to construct and maintain waterworks, or to obtain its water in any other lawful way.

Sixth. As the city is not bound by the contract to refrain from exercising its powers to construct and maintain waterworks, and as the terms of its contract with the complainant and the water company were that it should cease to have effect on April 9, 1904, its subsequent construction and operation of waterworks for its own benefit and that of its citizens would not be a violation of any of the express or implied terms of this contract, and would not entitle the complainant or the water company to any relief, if, under the Constitution and the statutes, the city had the lawful right to construct and operate them. If the city had lawful authority to build and operate rival works, neither the destructive competition nor the depreciation of the value of the property of the complainant and the water company would entitle them to any relief, because the infliction of this loss would not violate any legal or moral duty of the city, would not break or impair the obligation of any of its contracts, and would not take away any private property without compensation, within the meaning of the Constitution and the law. Irreparable injury alone furnishes no ground for equitable interposition. Damage inflicted by lawful competition is damnum absque injuria, and remediless. Skaneateles Waterworks Co. v. Skaneateles, 184 U. S. 354–367, 22 Sup. Ct. 400, 46 L. Ed. 585; Lehigh Water Co. v. Easton, 121 U. S. 388–390, 7 Sup. Ct. 916, 30 L. Ed. 1059.

The general doctrine that no legal damage arises from the lawful pursuit of another's rights and duties is well stated by the Supreme Court of Massachusetts in the case of Walker v. Cronin, 107 Mass. 555, where, at page 564, the following language is used:

"Every one has the right to enjoy the fruits and advantages of his own enterprise, industry, skill, and credit. He has no right to be protected against competition, but he has a right to be free from malicious and wanton interference, disturbance, or annoyance. If disturbance or loss come as a result of competition, or the exercise of like rights by others. it is damnum absque injuria, unless some superior right by contract or otherwise is interfered with. But if it come from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose,

it then stands upon a different footing, and falls within the principle of the authorities first referred to."

See, also, Passaic Print Works v. Ely & Walker D. C. Co., 105 Fed. 165, 44 C. C. A. 426, 62 L. R. A. 673.

It is said that the complainant and the water company have invested more than $430,000 in their plant in the faith that the city would not construct and operate rival works. If this municipality is without authority, or if it was forbidden, to build and maintain a rival plant by the Constitution or by the statutes of the state, that fact raises a persuasive—a controlling—equity, which entitles the complainant and the water company to relief, because they had the right to invest their money and to establish their business in the faith that the city would not be permitted to violate the Constitution or the law to destroy their property or their business. But if the city was lawfully authorized to construct and operate a rival plant, there is nothing in the contract or in the investment to forbid it. The thought that underlies the suggestion under consideration is that the city is equitably estopped by its acquiescence in the construction and operation of the plant of the water company and by its silence from building and maintaining rival works. But if the city has lawful authority to build and operate a rival plant, the case lacks two essential elements of an estoppel—ignorance of the complainant and of the water company, and deceit or fraudulent concealment by the city. Neither of these is to be found in this case. All the parties to this controversy knew that at the end of the 20 years the contract would no longer bind the city not to build and operate its own waterworks, because it plainly so declared. The city never made any concession or representation to the contrary. If the city had lawful authority to build and maintain its own works, the damage from prospective competition and taxation was irremediable.

It is argued that an injunction should be issued because the city is about to levy and collect a tax upon the property of the complainant and the water company for the purpose of constructing and maintaining its own works. But this contention is conditioned by the same considerations which have already been expressed. If the construction of the new works and the threatened taxation to build and maintain them is in violation of the Constitution and of the law, it is wrongful. It inflicts irreparable injury, and it presents an unanswerable ground for an injunction to forbid it. But if the city has lawful power to construct and maintain its own plant, it has the right to tax the property of the complainant and of the water company within its limits to pay for this construction and maintenance. The contract contains no express or implied agreement to the contrary.

We have been cited to the case of White v. City of Meadville, 177 Pa. 643, 35 Atl. 695, 34 L. R. A. 567, in support of the argument that a taxpayer may sustain a bill upon a contract similar to that here under consideration to enjoin a city from constructing a rival plant, although it has lawful power to do so under the Constitution and the law. After an examination, however, of the decisions of the Supreme Court, so far as that court has had occasion to intimate its

opinion upon this subject, and after the reading of some other well-reasoned opinions, it is not probable, we think, that this proposition will ever commend itself to the favorable consideration of that court.

In the case of Hamilton Gas Light & Coke Co. v. Hamilton City, 146 U. S., at page 268, 13 Sup. Ct. 93, 36 L. Ed. 963, the Supreme Court, Justice Harlan delivering the opinion, said:

"It may be that the stockholders of the plaintiff supposed at the time it became incorporated, and when they made their original investment, that the city would never do what is evidently contemplated by the ordinance of 1889, and it may be that the erection and maintenance of gasworks by the city at the public expense, in competition with the plaintiff, will ultimately impair, if not destroy, the value of the plaintiff's works for the purpose for which they were established; but such considerations cannot control the determination of the legal rights of the parties."

Again, in the same case it is said:

"If parties wish to guard against contingencies of that kind, they must do so by such clear and explicit language as will take their contracts out of the established rule that public grants, susceptible of two constructions, must receive the one most favorable to the public."

In Stein v. Bienville Water Supply Co., 141 U. S. 67, 11 Sup. Ct. 892, 35 L. Ed. 622, the Supreme Court said:

"We are forbidden to hold that a grant, under legislative authority, of an exclusive privilege, for a term of years, of supplying a municipal corporation and its people with water drawn by means of a system of waterworks from a particular stream or river, prevents the state from granting to other persons the privilege of supplying, during the same period, the same corporation and same people with water drawn in like manner from a different stream or river."

A very instructive case is the case of North Springs Water Co. v. City of Tacoma, 58 Pac. 773, 47 L. R. A. 214, where it was directly held by the Supreme Court of the state of Washington that the grant of a franchise to a water company, without any words of exclusion or of limitation upon the right of the city, did not preclude the city from subsequently establishing waterworks of its own, although the result would be to destroy the value of the franchise.

Our conclusion is that, if the city was lawfully authorized, under the Constitution and the statutes of the state of South Dakota, to construct and maintain its own waterworks in the way it threatens, and was proceeding to accomplish this end, then neither the franchise nor privilege granted to Kuhn and his assigns, nor any of the provisions of the city's contract with him, nor the investment made thereunder and its threatened loss furnish any tenable ground to invoke the aid of a court of equity to prohibit the city from constructing and operating its own waterworks. State ex rel. Hamilton Gas & Coke Co. v. Hamilton, 47 Ohio St. 52, 23 N. E. 935; Westerly Waterworks Co. v. Westerly (C. C.) 80 Fed. 611; Thomson-Houston Electric Co. v. Newton (C. C.) 42 Fed. 723; Colby University v. Canandaigua (C. C.) 69 Fed. 671; Long v. Duluth, 49 Minn. 280, 51 N. W. 913, 32 Am. St. Rep. 547; In re Borough of Millvale, 162 Pa. 375, 29 Atl. 641, 644; Long Island Water Supply Co. v. Brooklyn, 166 U. S. 685, 17 Sup. Ct. 718, 41 L. Ed. 1165; Syracuse Water Co. v. Syracuse, 116 N. Y. 167, 22 N. E. 381, 5 L. R. A. 546.

The question remains, has the city the lawful right, under the Constitution and the law, to construct and operate its own plant, and thereby inflict upon the complainant and upon the water company the irreparable injury which must follow its maintenance, and to tax their property to pay a part of the expenses of committing this injury? If its proposed action is in compliance with the Constitution and the law, it is justifiable, and the complainant and the water company are without remedy for the grave loss they must sustain. On the other hand, if its threatened action is in violation of the Constitution of the state, or if it is without lawful authority under the statutes, then its action is wrongful, unjustifiable, and, as the injury which will be inflicted upon the complainant and the water company must be irreparable, this wrongful action furnishes an unanswerable reason for the granting by a court of equity of the relief which they seek.

It is contended that the right of the complainant and the water company to restrain the city from constructing its works and taxing the property of the complainant and the water company, upon the ground that the city has proceeded without authority of the statute, and in violation of the Constitution, may not be litigated in this case, because it is not a cause of action of the complainant, but one brought into the case by the cross-bill of the water company, separate from, and not germane to, the issues presented by the original bill and answer. A cross-bill which presents a matter that is not a subject of litigation between the complainant and the defendants or between the defendant who presents the cross-bill and the complainant, and which does not aid in the determination of any of the issues presented in the original suit, is demurrable, and must be dismissed; but the right here asserted is the right to relief against irreparable damage to the property of the complainant and the property of the water company alike, arising from the alleged illegal construction of the city waterworks and the alleged illegal taxation of the property of both complainant and the water company. It is a cause of action of the complainant, because the depreciation of the property will deprive the complainant of the security for the payment of the bonds, and the increased taxation and damage to the property is clearly alleged in the original bill. Our conclusion is that the question is presented whether or not the contemplated injury to the security of the complainant by the threatened competition and taxation entitles the complainant to relief in case the city is proceeding without authority of law or in violation of the Constitution, and hence is in the position of a wrongdoer.

It now appears that the water company has invested in its waterworks system at Sioux Falls an amount in excess of $481,000; that the property created as a result of this investment has been lawfully acquired and is legally held; that the complainant has an interest in the property and the revenues derivable from the operation of the same to the extent of the indebtedness which the trust deed secures. The water company is the owner of the legal title. This property, being so situated, is entitled beyond question to the protection of the law of the land. No person or corporation may invade

such rights of property as are held by the complainant and the water company, except in pursuance of law. As the establishment and operation of a system of waterworks by the city will practically ruin the security of the complainant and the property of the water company, the serious question in this case is whether the city has proceeded in accordance with the law. If not, the injunction must be issued, because the complainant and the water company have no adequate remedy at law. It must be conceded that where a municipality is prohibited from incurring any indebtedness for the construction of a system of waterworks except under certain conditions, then that municipality has no power to construct a system of waterworks by means of the incurring of an indebtedness if these conditions do not exist. In other words, where a city has no power to incur an indebtedness for a particular purpose, it has no power to accomplish that purpose, or any part thereof, by means of the incurring of an indebtedness. Allen v. City of Davenport, 107 Iowa, 90, 77 N. W. 532; City of Helena v. Mills, 94 Fed. 916, 36 C. C. A. 1; City of Walla Walla v. Walla Walla Water Co., 19 Sup. Ct. 77, 43 L. Ed. 341; Grant v. City of Davenport, 36 Iowa, 396; City of East St. Louis v. St. Louis Gaslight & Coke Co., 98 Ill. 415, 38 Am. Rep. 97; Merrill Railway & Lighting Co. v. City of Merrill, 80 Wis. 358, 49 N. W. 965; Prince v. City of Quincy, 105 Ill. 138, 44 Am. Rep. 785; Foland v. Town of Frankton, 142 Ind. 546, 41 N. E. 1031; Smith v. Dedham, 144 Mass. 177, 10 N. E. 782; Wade v. Borough of Oakmont (Pa.) 30 Atl. 959; Keihl v. City of South Bend, 76 Fed. 921, 22 C. C. A. 618, 36 L. R. A. 228.

In the case of Loan Association v. Topeka, 20 Wall. 660, 22 L. Ed. 455, the Supreme Court says:

"It follows that in this class of cases the right to contract must be limited by the right to tax, and if, in the given case, no tax can lawfully be levied to pay the debt, the contract itself is void for want of authority to make it."

See, also, Sutherland-Innes Co. v. Village of Evart, 86 Fed. 597, 30 C. C. A. 305.

We now have to consider the contention of counsel for the complainant and the water company as to whether or not the city is proceeding according to law in its attempt to construct, maintain, and operate a system of waterworks of its own. Its power, if it has any, comes from the Constitution and laws of the state of South Dakota. Section 4, art. 13, of the Constitution of the state of South Dakota, adopted on the admission of the state into the Union, reads as follows:

"Sec. 4. The debt of any county, city, town, school district or other subdivision, shall never exceed five per centum upon the assessed value of the taxable property therein. In estimating the amount of indebtedness which a municipality or subdivision may incur, the amount of indebtedness contracted prior to the adoption of this Constitution shall be included."

In the year 1896 said section 4 of article 13 was amended to read as follows:

"Sec. 4. The debt of any county, city, town, school district, civil township, or other subdivision, shall never exceed five (5) per centum upon the assessed value of the taxable property therein. In estimating the amount of indebted-

ness which a municipality or subdivision may incur, the amount of indebtedness contracted prior to the adoption of this constitution shall be included: provided, that any county, municipal corporation, civil township, district or other subdivision may incur an additional indebtedness not exceeding ten per centum upon the assessed value of the taxable property therein for the purpose of providing water for irrigation and domestic uses: provided further, that no county, municipal corporation or civil township shall be included within any such district or subdivision without a majority vote in favor thereof of the electors of the county, municipal corporation, or civil township as the case may be, which is proposed to be included therein, and no such debt shall ever be incurred for any of the purposes in this section provided, unless authorized by a vote in favor thereof of a majority of the electors of such county, municipal corporation, civil township, district or subdivision incurring the same."

In the year 1902 the same section was again amended to read as follows:

"Sec. 4. The debt of any county, city, town, school district, civil township or other subdivision, shall never exceed five (5) per centum upon the assessed valuation of the taxable property therein for the year preceding that in which said indebtedness is incurred. In estimating the amount of the indebtedness which a municipality or subdivision may incur, the amount of indebtedness contracted prior to the adoption of the Constitution shall be included. Provided, that any county, municipal corporation, civil township, district or other subdivision may incur an additional indebtedness not exceeding ten per centum upon the assessed valuation of the taxable property therein for the year preceding that in which said indebtedness is incurred, for the purpose of providing water and sewerage for irrigation, domestic uses, sewerage and other purposes; and * * * provided further, that no county, municipal corporation, civil township, district or subdivision, shall be included within such district or subdivision without a majority vote in favor thereof of the electors of the county, municipal corporation, civil township, district or other subdivision, as the case may be, which is proposed to be included therein, and no such debt shall ever be incurred for any of the purposes in this section provided, unless authorized by a vote in favor thereof by a majority of the electors of such county, municipal corporation, civil township, district or subdivision incurring the same."

The indebtedness for the construction of the system of waterworks by the city was incurred in 1903; that being the year when the bonds were issued. In that year, and when the bonds were issued, the city was indebted, in round numbers, in the sum of $391,000. Its assessed valuation for the year 1902 was the sum of $2,739,598. The assessment of 1902 must be taken in considering the debt limit of the city, for the reason that section 4 of the Constitution, herein referred to, as amended in 1902, limits the indebtedness for water purposes to 10 per centum upon the assessed value of the taxable property therein for the year preceding that in which said indebtedness is incurred. This indebtedness would be nearly 15 per cent. of the assessed value for the year 1902 and over 9 per cent. above the limit for general purposes mentioned in section 4. Adding to this indebtedness the $210,000 of waterworks bonds, and it makes an indebtedness of over 21 per cent.; and if the city had a right, as is claimed by counsel for the city, to impose a tax of 10 per cent. upon the assessed valuation, regardless of existing indebtedness, and the whole amount of 10 per cent. was voted, there would be an indebtedness of nearly 25 per cent. on the assessed valuation, which is enough to make one pause. If this power exists to impose taxes in the city

of Sioux Falls, one may well consider whether or not one is fortunate to own property therein. If the existing indebtedness of the city is to be considered, then the issuance of the waterworks bonds was clearly in excess of any authority possessed by the city, and it was wholly without power to incur the indebtedness; and, if wholly without power to incur the indebtedness, it had no power at all; and, unless we stray from the plain language of the Constitution and wander into the realms of speculation, we are of the opinion that the power did not exist on the part of the city to incur an indebtedness of 10 per cent. on the assessed valuation of the city for 1902 for water purposes, regardless of its then existing indebtedness. The language of the Constitution is a plain, prohibitive limitation upon the power of municipalities to incur an indebtedness for the purpose mentioned. It should receive a strict construction, or else it will serve no purpose. As the language of section 4 of the Constitution is plain and unambiguous, where else shall we go to find its meaning? Section 4 as it originally stood in the Constitution, provided that the debt of any county, city, town, school district, or other subdivision should never exceed 5 per centum upon the assessed valuation of the taxable property therein. It also provided that in estimating the amount of indebtedness which a municipality or subdivision may incur the amount of indebtedness contracted prior to the adoption of this Constitution should be included. Here we have a positive limitation of 5 per centum on the assessed valuation of the taxable property in such municipal corporations, including existing indebtedness. In 1896 an amendment of said section was adopted by the people, providing that any county, municipal corporation, civil township, district, or other subdivision may incur an additional indebtedness, not exceeding 10 per centum upon the assessed valuation of the taxable property therein, for the purpose of providing water for irrigation and domestic uses, and in estimating the amount of indebtedness the indebtedness already existing is included. The question now arises as to what meaning should be given to the word "additional" in the amendment. Additional to what? There was already a 5 per cent. limitation for general purposes in the section, and the natural, logical, and ordinary meaning that would be given to the word "additional" would be additional to the 5 per cent. already limited; in other words, that the indebtedness of this municipal corporation might ascend to the limit of 5 per cent. for general purposes, and might continue to ascend to 15 per cent. for the purpose of supplying water. If the members of the Legislature who proposed, and the people who adopted, this amendment, intended that the 10 per cent. should be additional to the already existing indebtedness of said corporations, why did they not say so? It would have been a simple thing to do, and the fact that it was not done is strong argument that they did not have any such intention. If the people, in their Constitution, have plainly and without ambiguity declared the law, this court has no authority to guess and surmise what the people intended. Their intention must be gathered from what they said. There are several reasons which occur to us that are convincing that section 4, as amended, means just what it says.

First. The members of the Legislature who proposed, and the

people of the state who adopted, the amendment, already knew that the section contained the 5 per cent. limitation. Now, the members of the Legislature and the people must be presumed to have acted intelligently, and with a knowledge as to what they were doing. They could vote intelligently upon the proposition as to whether 10 per cent. should be added to the 5 per cent. limitation for water purposes; but if we adopt the contention of counsel on the part of the city that they intended to fix a 10 per cent. limitation for water purposes upon the assessed valuation of property within the municipality, regardless of the existing indebtedness, how could they have acted or voted intelligently? No member of the Legislature knew what the existing indebtedness of any particular municipality or district referred to in said section amounted to, and yet we are urged to hold that they intended to limit the power to tax for water purposes to 10 per cent. upon the assessed valuation, regardless of existing indebtedness. For example, take the city in this case. Its indebtedness in 1903 appears to have been nearly 15 per cent. of its assessed valuation. To adopt the construction contended for by the city, this amendment would authorize the city of Sioux Falls to have incurred a 10 per cent. indebtedness in addition to the 15 per cent. That is, although the Constitution had limited its indebtedness for general purposes to 5 per cent., and for water purposes to 10 per cent. additional, it could lawfully impose a taxation of 25 per cent., so that if, as contended by counsel for the city, the 10 per cent. limitation is regardless of existing indebtedness, we have a limitation of 25 per cent. Of what account are constitutional limitations upon the power to incur indebtedness if this state of affairs can exist?

It is contended that the members of the Legislature who proposed, and the people who voted upon, the amendments both of 1896 and 1902, must have known that many municipalities had already exceeded the 5 per cent. constitutional limitation, and that they amended the section with that knowledge. We think this proves too much. Is it to be presumed that the members of the Legislature who proposed, and the people who voted upon, these amendments, had no care whatever as to whether any municipality had exceeded this 5 per cent. limitation? If they knew that the city of Sioux Falls was indebted to an extent amounting to 15 per cent. of the assessed valuation of its taxable property, did they intend to give its officers the authority to confiscate all the property of the citizens of Sioux Falls by increasing the 15 per cent. to 25 per cent.? We should hesitate very long before we should find that the members of the Legislature who proposed, and the people who voted upon, the amendments intended any such result.

It is contended that to say that the 10 per cent. limitation of the amendment was to be additional to the 5 per cent. limit would have conferred unequal benefits upon the different municipalties and other subdivisions mentioned in the amendments. The only presumption for courts to indulge in in construing constitutions and statutes is to presume that the members of the Legislature or the people intended no violation of law when they acted, nor intended to ratify or indorse violations of law. If we must presume that they knew

anything about the matter, we must presume that they knew the limitation was 5 per cent., and that they did not know that municipilities and other subdivisions had already violated the Constitution.

There is another reason, we think, why the amendments should be construed as a limitation to 10 per cent. in addition to the 5 per cent. in the general section, and that is, section 17 of article 6 of the Constitution of South Dakota reads as follows:

"No tax or duty shall be imposed without consent of the people, or their representatives in the Legislature, and all taxation shall be equal and uniform."

Different sections of a Constitution must be construed, if possible, with reference to the whole Constitution. They must be so construed as to give effect to all sections of the instrument. Here is a mandate of the people, expressed in their Constitution, that all taxation shall be equal and uniform. By section 4, art. 13, of the Constitution, we have a limitation of 5 per cent. If we construe the amendment as giving an additional 10 per cent. for waterworks purposes to the 5 per cent., we have, so far as the law is concerned, an equal and uniform law of taxation. Property may be taxed for general purposes to the limit of 5 per cent. The indebtedness may ascend for water purposes to 15 per cent. Now, if the contention that the 10 per cent. limitation is exclusive of existing indebtedness shall obtain, then, notwithstanding the limitation in section 4 of 5 per cent., and a 10 per cent. limitation, the city of Sioux Falls may impose a tax upon its citizens of nearly 25 per cent. This certainly would create a great lack of uniformity among the several municipalities of the state in regard to the limit of their indebtedness. The absolute absurdity of the contention appears when we consider the language of section 4, where it appears that the municipalities therein mentioned shall never exceed 5 per cent., and then say that a city that has violated this section by an excess of 10 per cent. over the 5 per cent. limit may still raise the indebtedness 10 per cent. more. This would make the proviso destroy the main section, for it would directly sanction the unlawful indebtedness already existing over 5 per cent. Instead of wandering from the plain chart made by the people into the realms of speculation in order to find the meaning of the section, let us look at the chart itself. There the meaning is clear. The limitations upon the power of the people to tax themselves should not be construed so as to destroy the limitations themselves. It will be profitable at this point to quote from the language of the Supreme Court in Lake County v. Rollins, 130 U. S. 670, 9 Sup. Ct. 652, 32 L. Ed. 1060:

"We are unable to adopt the constructive interpolations ingeniously offered by counsel for defendant in error. Why not assume that the framers of the Constitution and the people who voted it into existence meant exactly what it says? At the first glance, its reading produces no impression of doubt as to its meaning. It seems all sufficiently plain, and in such case there is a well-settled rule which we must observe. The object of construction, applied to a Constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself. And when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for the meaning beyond the

instrument. To get at the thought or meaning expressed in a statute, a contract, or a Constitution, the first resort, in all cases, is to the natural signification of the words in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning, which involves no absurdity, nor any contradiction of other parts of the instruments, then that meaning, apparent on the face of the instrument, must be accepted; and neither the courts nor the Legislature have the right to add to it or take from it. Newell v. People, 7 N. Y. 9, 97; Hills v. Chicago, 60 Ill. 86; Dean v. Reid, 10 Pet. 524, 9 L. Ed. 519; Leonard v. Wiseman, 31 Md. 201, 204; People v. Potter, 47 N. Y. 375; Cooley, Const. Lim. 57; Story on Const. § 400; Beardstown v. Virginia, 76 Ill. 34. So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or implied, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. United States v. Fisher, 2 Cranch, 358, 399, 2 L. Ed. 304; Doggett v. Florida Railroad, 99 U. S. 72, 25 L. Ed. 301. There is even stronger reason for adhering to this rule in the case of a Constitution than in that of a statute, since the latter is passed by a deliberate body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination, and fuller opportunity exists for attention and revision of such a character, while Constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a state, the most of whom are little disposed, even if they were able, to engage in such refinements. The simplest and most obvious interpretation of a Constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption."

In Law v. People, 87 Ill. 385, the Supreme Court of Illinois said:

"But should it work hardship to individuals, that by no means warrants the violation of a plain and emphatic provision of the Constitution. The liberty of the citizen and his security in all his rights in a large degree depend upon the rigid adherence to the provisions of the Constitution and the laws and their faithful performance. If courts, to avoid hardships, may disregard and refuse to enforce their provisions, then the security of the citizen is imperiled. Then the will—it may be the unbridled will—of the judge would usurp the place of the Constitution and the laws, and the violation of the provision is liable to speedily become a precedent for another, perhaps more flagrant, until all constitutional and legal barriers are destroyed, and none are secure in their rights. Nor are we justified in resorting to strained construction or astute interpretation to avoid the intention of the framers of the Constitution, or the statutes adopted under it, even to relieve against individual or local hardships. If unwise or hard in their operation, the power that adopted can repeal or amend and remove the inconvenience. The power to do so has been wisely withheld from the courts, their function only being to enforce the laws as they find them enacted."

In opposition to our view of the meaning of section 4 of the Constitution we are cited to the cases of Wells v. City of Sioux Falls (S. D.) 94 N. W. 425; People v. City Council (Utah) 64 Pac. 460; Graham v. Spokane (Wash.) 53 Pac. 714; Smith v. City of Seattle (Wash.) 65 Pac. 612.

Wells v. City of Sioux Falls is a decision of the Supreme Court of South Dakota rendered April 7, 1903, and in which decision the said court construes section 4 of article 13, now under consideration, with reference to the point as to the meaning of the additional 10 per cent. limitation. The court in that case arrives at the conclusion that the 10 per cent. limitation is independent of the 5 per cent. limitation and confers authority to tax for water purposes up to the limit of 10 per cent. of the assessed valuation of taxable property in the municipalities mentioned, irrespective of existing indebtedness, whether within the limit of 5 per cent. or in excess thereof. We

may admit that where, as a general proposition, the construction or validity of a state statute does not involve rights acquired upon the faith of the statute or earlier decisions, it is the duty of the federal courts to accept the decisions of the higher court of the state in regard to the construction of state statutes; but in the case at bar the rights of complainant and the water company became vested long prior to the decision in the Wells Case, and the original bill and original cross-bill were filed long prior to the commencement of or decision in the Wells Case, and we are bound in this proceeding to exercise our own independent judgment as to the meaning of the constitutional provision in question. Burgess v. Seligman, 107 U. S. 33, 2 Sup. Ct. 10, 27 L. Ed. 359; Bartholomew v. City of Austin, 85 Fed. 359, 29 C. C. A. 568; City of Ottumwa v. City Water Supply Co., 119 Fed. 324, 56 C. C. A. 219, 59 L. R. A. 604; Speer v. Board County Commissioners, 88 Fed. 760, 32 C. C. A. 101; Pleasant Township v. Ætna Life Ins. Co., 138 U. S. 67, 11 Sup. Ct. 215, 34 L. Ed. 864; Louisville Trust Co. v. City of Cincinnati, 76 Fed. 296, 22 C. C. A. 334; Jones v. Hotel Co., 86 Fed. 370, 30 C. C. A. 108; Great Southern Fire Proof Hotel Co. v. Jones, 193 U. S. 532, 24 Sup. Ct. 576, 48 L. Ed. 778; Columbia Ave. Sav. Fund Co. v. City of Dawson (C. C.) 130 Fed. 166. It would cause this opinion to become too long to quote extracts from the cases cited, but they firmly establish the principle here laid down. It seems to us that the construction placed upon the amendment by the Supreme Court of South Dakota would entirely obliterate the word "additional" from the section, and, with due respect to the judgment of the Supreme Court of South Dakota, we cannot follow its interpretation of the section. The case of Wells v. City of Sioux Falls we have the right to characterize as a friendly litigation for the purpose, no doubt, of obtaining the opinion of the Supreme Court as to the proper interpretation to place upon section 4, and also for the purpose of having an interpretation placed upon it which was favorable to the issuance of the bonds. The record shows that the summons was issued and the complaint verified on January 16, 1903, and the answer was duly verified and filed on the 17th day of the same month. A demurrer was interposed by plaintiff in that suit to the answer of the defendant, and the circuit court for Minnehaha county, S. D., overruled the demurrer the same day on which the answer was filed. An undertaking on appeal was waived by stipulation of counsel, and on the same day, to wit, the 17th day of January, 1903, the case was appealed, and the record certified to the Supreme Court of the state, and on the 7th day of April, 1903, the judgment of the Supreme Court was rendered affirming the judgment of the court below. We are well aware that cases in courts may be expedited, but as long as the question to be decided was involved in this action, what need was there of so much haste? Litigants in the federal tribunals cannot under the circumstances of this case be foreclosed in such a manner.

As to the proper construction to be placed upon constitutional limitations, the following cases can be read with profit: Dudley v. Board of Commissioners, 80 Fed. 672, 26 C. C. A. 82; People v. May, 9 Colo. 80, 10 Pac. 641; Sutliff v. Commissioners, 147 U. S. 230, 13

Sup. Ct. 318, 37 L. Ed. 145; Lake County v. Rollins, 130 U. S. 662, 9 Sup. Ct. 651, 33 L. Ed. 1060.

For the reasons thus stated, we are of the opinion that, as the city of Sioux Falls had an existing indebtedness, at the time the so-called waterworks bonds were issued, of nearly 15 per cent. of the assessed valuation of taxable property in said city for the year 1902, said city had no power to incur the indebtedness, and therefore no power to construct and maintain a system of waterworks.

We are also of the opinion that the people of the city of Sioux Falls never voted upon the proposition, as required by the Constitution, as to whether they would incur an indebtedness in the sum of $210,000 for the construction of a system of waterworks in said city, for the reasons (a) that no election was held for the purpose of voting upon said proposition after the adoption of the amendment to the Constitution of 1902; and (b) that, if the election held November 5, 1901, would authorize the issuance of bonds after the adoption of the constitutional amendment of 1902, then that the people never voted upon the proposition as to whether they would incur an indebtedness to construct waterworks, for the reason that the proposition submitted to them was whether the city of Sioux Falls should issue its bonds to the amount of $210,000 for the purpose of constructing, equipping, maintaining, and operating or purchasing a system of waterworks to provide water for domestic uses. Section 4 of article 13, as it was amended in 1902, contained this provision, as already quoted in the statement of facts:

"Provided further, that no county, municipal corporation, civil township, district or subdivision shall be included within such district or subdivision without a majority vote in favor thereof of the electors of the county, municipal corporation, civil township, district or other subdivision, as the case may be, which is proposed to be included therein, and no such debt shall ever be incurred for any of the purposes in this section provided, unless authorized by a vote in favor thereof by a majority of the electors of such county, municipal corporation, civil township, district or subdivision incurring the same."

The same section was also amended at the same time by changing the language of the first proviso so that the limit of indebtedness should be 10 per cent. upon the assessed valuation of the taxable property therein for the year preceding that in which said indebtedness is incurred, while the proviso of the amendment adopted in 1896 said nothing about the year in which the assessed valuation should be taken, but from its language it would mean the assessed valuation of taxable property in the year in which the indebtedness was incurred, if an assessment had been made. This amendment to section 4, art. 13, in 1902, operated prospectively, and required legislative action in order to carry out its provisions; but the prohibitory limitation that the 10 per cent. limit should only be expended for the purposes mentioned, unless authorized by a vote in favor thereof by the majority of the electors of such county, municipal corporation, civil township, district, or subdivision incurring the same, was self-executing, and operated directly upon all municipalities or subdivisions mentioned in the section, so that from and after the date of the adoption of the amendment no indebtedness could be incurred unless it was authorized by a vote, as stated in the amendment. The

amendment of 1902 changed the language as to the time when the assessed value should be taken; in other words, a person inquiring in regard to the bonds issued by the city in 1903 would be bound to know of the constitutional limitations contained in section 4 of article 13. He would then inquire whether or not any vote had ever been taken to authorize the bonds subsequent to the amendment of 1902. There could be only, upon this record, one answer to that question, and that would be "No"; that the election was held in November, 1901.

We think the case of Norton v. Brownsville, 129 U. S. 479, 9 Sup. Ct. 322, 32 L. Ed. 774, is decisive of this question. In delivering the opinion of the court in the case cited Chief Justice Fuller says:

"It is clear that the inhibition imposed by section 29 of the Constitution of 1870 operates directly upon the municipalities themselves, and is absolute and self-executing. These cases [referring to several cases cited] sufficiently illustrate the distinction between the operation of a constitutional limitation upon the power of the Legislature and of a constitutional inhibition upon the municipality itself. In the former case past legislative action is not necessarily affected, while in the latter it is annulled."

The amendment to the Constitution of 1902 requires that, before the 10 per cent. limit of indebtedness can be incurred, it must be authorized by a majority vote of the electors. The law under which the city took the vote in 1901, being chapter 53, p. 62, Sess. Laws S. D. 1899, required that a majority of the electors of such city should be determined by the vote cast for the mayor of the city at the last preceding election for such officer; while section 4 of article 13, as amended in 1902, and as such language has been construed by the Supreme Court of the United States, declared a majority of the electors should be a majority of those present and voting at the election. In the case of Norton v. Brownsville, supra, the Legislature of the state of Tennessee had passed a special act allowing the city of Brownsville to vote bonds, and the city had voted bonds unanimously; but before the bonds were issued the people adopted a new Constitution, which, in addition to the former provisions authorizing the issue of such bonds, required a three-fourths majority in their favor. It was contended that, the vote being unanimous, the requirement of the Constitution was satisfied; that the act under which the bonds were voted was a private or special act, and therefore was taken out of the general rule as to repeals; that the Constitution repealed only what was repugnant, and left the balance in force; that under another provision of the Constitution, which declared that all laws not inconsistent with the Constitution should remain in force, only inconsistent provisions were repealed. But the Supreme Court held that the inhibition was upon the action of the municipalities, and, unlike inhibition or limitation upon Legislatures, must be strictly construed, and in that case, although bonds had been previously voted by unanimous vote, the court held them void for the reason that they had not been authorized in accordance with the provisions of the new Constitution, which only required a three-fourths vote. We see no reason why the case cited does not rule the law in this case, and, when applied to the facts, it renders wholly

nugatory the vote taken in November, 1901, so far as said election shall be invoked as authority to issue bonds in 1903. The following cases also sustain the view here expressed: Aspinwall v. Commissioners of County of Daviess, 22 How. 364, 16 L. Ed. 296; Town of Concord v. Portsmouth Savings Bank, 92 U. S. 625, 23 L. Ed. 628; Wadsworth v. Supervisors, 102 U. S. 534, 26 L. Ed. 221; Norton v. Shelby County, 118 U. S. 425, 6 Sup. Ct. 1121, 30 L. Ed. 178; Concord v. Robinson, 121 U. S. 165, 7 Sup. Ct. 937, 30 L. Ed. 885; Pearsall v. Great Northern Ry., 161 U. S. 646, 16 Sup. Ct. 705, 40 L. Ed. 838; Falconer v. Buffalo & J. R. Co., 69 N. Y. 491; Covington & L. R. Co. v. Kenton County Court, 12 B. Mon. 144; Fidelity Trust & Safety Vault Co. v. Lawrence Co., 92 Fed. 576, 34 C. C. A. 553; Wagner v. Meety, 69 Mo. 150; State ex rel. Wilson v. Garroutte, 67 Mo. 445; List v. City of Wheeling, 7 W. Va. 501; Cumberland & O. R. Co. v. Barren County Court, 10 Bush, 604.

We now come to the submission of the question of issuing bonds to the voters of the city of Sioux Falls. The election in November, 1901, was held in pursuance to chapter 53, p. 62, Sess. Laws S. D. 1899. Section 1 of said chapter 53 provides:

"That there is hereby granted to cities of the first class the right and power to issue bonds for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks for the purpose of providing water for domestic uses."

Section 2 of the same chapter provides:

"The city council of any such city may, by resolution passed by a majority of the aldermen-elect at any regular meeting of such city council or special meeting called for that purpose, call a special election and submit the question of the issuance of such bonds to the electors thereof."

Said section further provides that such resolution shall set forth, among other things, the purposes for which they are to be issued. By reference to section 2 of the ordinance passed by the city in October, 1901, the following language is found:

"The question submitted to the legal voters of said city as provided in section 1 shall be as follows: Shall the city of Sioux Falls issue its bonds to the amount of $210,000 for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks for the uses and purposes of said city and for providing water for domestic uses?"

In the resolution calling the special election the following language is found:

"That a special election be held on the 5th day of November, A. D. 1901, for the purpose of submitting to the legal voters of the city of Sioux Falls, South Dakota, the question whether the said city of Sioux Falls shall issue its bonds for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks to provide water for domestic uses."

The notice of special election contained the following language:

"That notice is hereby given that a special election will be held on Tuesday, November 5, 1901, for the purpose of submitting to the legal voters of the city of Sioux Falls, South Dakota, the question whether said city of Sioux Falls shall issue its bonds to the amount of $210,000, to run twenty years from the date of their issuance and to bear interest not to exceed 5% per annum; said bonds to be issued for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks to provide water for domestic uses."

It will be plainly seen that the city under the act of 1899 had the power to issue bonds, provided they complied with the constitutional requirements, for the purpose of constructing, equipping, maintaining and operating or purchasing a system of waterworks for the purpose of providing water for domestic uses. Manifestly, the city could not construct and maintain a system of waterworks and also purchase a system at the same time. The power conferred is in the alternative, but the question, as appears in the ordinance, resolution, and notice of special election, was submitted to the voters in the language of the law in the alternative. It thus results that no voter has had the privilege of voting upon the question as to whether he was in favor or not in favor of issuing bonds in the sum of $210,000 for constructing, equipping, and maintaining a system of waterworks. He might have been in favor of the construction of the waterworks system and against purchasing a system, or he might have been in favor of purchasing a system and against constructing one; but he could not vote for one without he voted for both, and the result is that he cannot be said to have voted upon either proposition.

The case of Elyria Gas & Water Co. v. City of Elyria, 57 Ohio St. 374, 49 N. E. 335, is a case directly in point, and we agree thoroughly with the reasoning of the learned court in its opinion filed in that case, and we think we cannot do better than quote from the opinion in that case as follows:

"There is, we think, another fatal objection to this resolution. It declares the necessity for the issue and sale of the city's bonds for the purpose of the purchase and erection of waterworks, and provides for the submission of the question of so issuing and selling the bonds, at the election to be held under the resolution, for the purposes thus declared. The power conferred by the statute on the council is to issue and sell the bonds of the municipality for the erection or purchase of waterworks. The two purposes are entirely distinct. The purchase of waterworks necessarily implies that they have already been erected, and are a present existing property, the subject of sale and purchase; while the erection of waterworks can only have reference to their future construction. That a municipal corporation may own two plants, one acquired by purchase and another erected by it, or, after having acquired one in the former mode, may proceed to erect a new plant. is not questioned. But their acquisition by these two different methods requires different proceedings. And it is the policy of the statute that the proposition for each separate improvement shall stand on its own merits, unaided by combination with any other measure, and be so acted upon by the council in the first instance, and then, if adopted, be so submitted for approval by the electors that each may be voted upon as a separate measure, uninfluenced by combination with others. The reason is that the requisite majority of the council and of the electors may be in favor of one measure and against the other or against each; while by uniting them as one, and submitting them to be acted upon in that form, the members of council and the electors are required to vote for or against both propositions combined, or abstain from voting at all, and thus denied the right to express their will with respect to each. A resolution declaring the necessity for the issue and sale of municipal bonds for the purchase and erection of waterworks is not a resolution for either purpose separately, but for both purposes combined: nor is a vote in favor of issuing bonds for both purposes a vote in favor of either separately. And the attempt, in the proceedings subsequent to the resolution, to eliminate the declared purpose to issue bonds for the purchase of waterworks, and thereafter carry the measure to completion as one for the erection of waterworks only, does not obviate the objection. The subsequent proceedings must conform to the resolution. It cannot

131 F.—58

be altered or amended by them. A substantial departure from the resolution leaves the proceedings without foundation to support them. A resolution declaring a necessity for one purpose does not authorize proceedings for the accomplishment of another; nor does a resolution declaring a necessity for two or more purposes combined authorize proceedings for the accomplishment of any one of them separately."

The proposition stated in the language quoted seems to state the true rule, and in fact there seems to be no conflict of authority upon the proposition. The following cases may be cited in further support thereof: McBryde v. City of Montesano (Wash.) 34 Pac. 559; Supervisors of Fulton County v. Mississippi & Wabash R. R. Co., 21 Ill. 338; People v. County of Tazewell, 22 Ill. 147; Village of North Tonawanda v. Western Transportation Co., 1 Sheld. 371; Hensly v. City of Hamilton, 3 Ohio C. Ct. 201; Jones v. Hurlburt, 13 Neb. 125, 13 N. W. 5; Garrigus v. Board of Commissioners of Parke Co., 39 Ind. 66; Bronenberg v. Board of Commissioners of Madison County, 41 Ind. 502; Finney v. Lamb, 54 Ind. 1; Lewis v. Commissioners of Bourbon County, 12 Kan. 186; Springfield & Illinois South-Eastern Ry. Co. v. County Clerk of Wayne County, 74 Ill. 27; City of Leavenworth v. Wilson (Kan.) 76 Pac. 400.

The discussion of the proposition affecting the power of the city to incur indebtedness for the construction and operation of a system of waterworks could be further extended, but at the risk of making this opinion, already quite lengthy, more so. We believe that sufficient has been stated to present plainly the views of the court. It seems to us that the failure to vote upon the issuance of bonds under the amendment of 1902, the submission of the question of issuing the bonds in the alternative at the election of 1901, and the fact that the city of Sioux Falls, in 1903, was already indebted nearly 15 per cent. of the assessed valuation for 1902, shows an absolute want of power in the city to construct, operate, and maintain a system of waterworks of its own; it having, under the law, and the way the city proceeded, no power to incur an indebtedness therefor.

The result is that a perpetual injunction must issue against the threatened construction and operation of a system of waterworks by the city.

The counsel for the respective parties to this litigation have presented with marked diligence and eminent ability every argument which occurs to us that could lawfully be urged in support of the claims of their respective clients. The evidence, the arguments, and the citations of authority have been considered by the court, not without some study, deliberation, and reflection. For the reasons which have now been stated, the Constitution of the state of South Dakota and the law of the land leave us, in our opinion, no alternative but the announcement of the conclusion which has been reached. Fortunately the result which the law compels appears to be just and equitable. It entails no substantial additional loss or injury upon any of the parties to the controversy. The bond which was given by the water company when the preliminary injunction was issued secures to the city a restoration to its treasury of all the moneys it has expended in the construction of its contemplated works. The citizens of the municipality may be relieved from the imminent bur-

den of an increase of taxation, already too heavy, and the complainant and the water company from the threatened destruction of a property and business lawfully acquired in the faith that the Constitution and the law would be obeyed.