## PLEASANT TOWNSHIP *v.* ÆTNA LIFE INSURANCE COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

No. 1214. Submitted December 18, 1890. — Decided January 19, 1891.

The act of the legislature of Ohio of April 9, 1880, authorizing townships having a population of 3683 under the census of 1870, "to build railroads and to lease or operate the same," and "to borrow money" "as a fund for that purpose," and "to issue bonds therefor in the name of said township," is repugnant to the provision in article 8, section 6 of the constitution of that State, which provides that "the general assembly shall never authorize any county, city, town or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or loan its credit to or in aid of any such company, corporation or association"; and bonds of such a township, issued under the supposed authority of said act, are void.

It appearing that a decision of the highest court of the State of Ohio, made prior to the issue of the bonds in controversy in this action, as to the validity of such municipal bonds, was, argumentatively at least, in conflict with decisions of the same court made after the issue of such bonds, this court, following the rule laid down in *Douglass* v. *Pike County*, 101 U. S. 677, and *Burgess* v. *Seligman*, 107 U. S. 20, in the exercise of its independent judgment, finds the issue here in controversy to be invalid.

THIS was an action at law, to recover upon bonds issued by the plaintiff in error to aid in the construction of a railway,

under the act of the legislature of Ohio of April 9, 1880. Demurrer to the petition, judgment for the plaintiff on the demurrer, to review which the defendant sued out this writ of error. The case is stated in the opinion.

*Mr. Isaiah Pillars, Mr. John H. Doyle* and *Mr. I. N. Alexander* for plaintiff in error.

*Mr. John C. Lee* for defendant in error.

Mr. JUSTICE BREWER delivered the opinion of the court.

This is an action on bonds issued by the plaintiff in error under the authority of an act of the legislature of Ohio, of April 9, 1880. (77 Ohio Laws, pages 157 and following.[1]) The single question for consideration is the constitutionality of that statute. For if the act is unconstitutional, the bonds

---

[1] " An act to authorize certain townships to build railroads, and to lease or operate the same.

" [PLEASANT TOWNSHIP, VAN WERT COUNTY.]

" SECTION 1. *Be it enacted by the General Assembly of the State of Ohio,* That whenever in any township, which by the federal census of 1870 had, and which by any subsequent federal census may have, a population of thirty-six hundred and eighty-three, the township trustees thereof shall, on the petition of not less than one hundred resident tax-payers of such township, pass a resolution declaring it to be essential to the interest of such township that a line of railway shall be constructed on the line to be designated in said petition, and said railway shall be named in said resolution, and the termini thereof shall be designated therein, and not to exceed seven miles in length. That it shall be lawful for a board of trustees appointed as herein provided, and they are hereby authorized to borrow as a fund for the purpose, not to exceed the sum of forty thousand dollars, and to issue bonds therefor in the name of said township, bearing interest at a rate not to exceed six per centum per annum, payable semi-annually. Said bonds to be payable at such time and places, and in such sums as shall be deemed best by said board. Said bonds shall be signed and sealed by the president of said board, and attested by the clerk of such township, who shall keep a register of the same, and they shall be secured by pledge of the faith of such township, and a tax which it shall be the duty of the trustees thereof annually to levy (which tax shall not exceed three mills on the dollar in any one year), to pay the interest and provide a sinking fund for final redemption of said bonds. . . . "

were issued without authority, and are not binding upon the township; while, on the other hand, if it is constitutional and valid, no question is made as to the regularity of the proceedings which ended in the issue of the bonds.

To obtain a clear understanding of this question a reference must be had to the constitution, legislation and judicial decisions of the State, in respect to railroad bonds. The constitution of Ohio, adopted in 1851, contained in article 8, section 6, this prohibition: " The general assembly shall never authorize any county, city, town or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation or association whatever; or to raise money for, or loan its credit to or in aid of, any such company, corporation or association." This provision was inserted in the constitution, and adopted by the people, in view of the fact then and since well known in the history of all States, particularly in the West, that municipal bonds to aid railroads were freely voted in expectation of large resulting benefits — an expectation frequently disappointed. It was a declaration of the deliberate judgment of the people of Ohio that public aid to such *quasi* public enterprises was unwise, and should be stopped. The first effect of this constitutional provision was the full withholding of all public aid to railroad enterprises. Nothing broke this clear record of exemption from taxation for railroad enterprises until 1869, when, on the 4th day of May of that year, the legislature passed an act which, though general in its terms, as applicable only to cities having exceeding one hundred and fifty thousand inhabitants, was, by the existing condition of municipalities, one in fact having reference solely to the city of Cincinnati. This act authorized such city to issue bonds, and out of the proceeds thereof construct a railway, one of the termini of which should be the city. The validity of this act was sustained by the Supreme Court of the State, at its December, 1871, term, in the case of *Walker* v. *The City of Cincinnati*, 21 Ohio St. 14.

On April 22, 1872, the legislature passed an act to authorize counties, townships and municipalities to build railroads. (69 Ohio Laws, 84.) This act was general in its terms, and gave

power to any county, township or municipality to issue bonds
and build railroads, under certain restrictions. At the Decem-
ber, 1872, term, this act was adjudged unconstitutional and
void, as in conflict with article 8, section 6, heretofore quoted.
*Taylor* v. *Ross County*, 23 Ohio St. 22.

In 1880 several acts were passed by the legislature, author-
izing certain townships to build railroads. These acts were
general in form, but special in fact. The one under which
these bonds were issued (77 Ohio Laws, 157) commences with
these words : " Be it enacted by the general assembly of the
State of the Ohio, That whenever in any township, which by
the federal census of 1870 had, and which by any subsequent
federal census may have, a population of thirty-six hundred
and eighty-three." The other acts passed contemporaneously
with this, by similar language, necessarily applied immediately
to townships north or south, and so situated as to include only
those on the continuous line of a railroad already projected and
surveyed. One of these acts, precisely like that under which
the bonds in controversy were issued, was brought before the
Supreme Court of Ohio at the January term, 1881, and
adjudged void, as in conflict with the section heretofore
referred to. *Wyscaver* v. *Atkinson*, 37 Ohio St. 80. And a
like ruling was made in *Counterman* v. *Dublin Township*, 38
Ohio St. 515. While the particular act under which these
bonds were issued does not appear to have been presented to
that court, yet, as appears above, acts identical, save in the
language describing the township, and passed at the same ses-
sion, and obviously part of a single scheme, have been presented
to that court, and by it declared void. In the judgment,
therefore, of her highest tribunal, this act of the legislature of
the State of Ohio is unconstitutional, and the bonds issued
under it are without authority of law and invalid.

It is true that the defendant in error became the purchaser
and holder of these bonds before these last adjudications of
the state court. It did not, therefore, buy with judicial decla-
ration that the series of acts, under one of which it claims,
was in conflict with the constitution; and yet, it purchased
without any such declaration that it was valid. It is claimed

that this act of 1880 was modelled on the statute of 1869 — the Cincinnati act heretofore referred to; and that, therefore, though not in terms, yet in fact, there had been a previous judicial affirmation of the highest court in the State in favor of such legislation. The rule laid down in *Douglass* v. *County of Pike*, 101 U. S. 677, is invoked; and it is urged, that whatever decision may have been made by the Supreme Court of Ohio since the purchase of these bonds by defendant in error, its prior rulings were in favor of the constitutionality of such legislation and the validity of the bonds; and that, therefore, such judicial determination entered into and established the contract of the township, and forever settled the validity of those bonds. Such was the view of the learned circuit judge who decided this case. We would not weaken in the least the authority of the case of *Douglass* v. *County of Pike, supra.* There comes, incidentally, into this case that which is abundant justification of the rule there announced. The city of Cincinnati, under the authority of the act of 1869, issued many millions of bonds. These bonds are current in the market, endorsed by the legislative act authorizing the city to issue them, by the vote of the people of the city in favor of their issue, and by the judicial declaration of the highest court of the State that the act of the legislature was constitutional and valid. With such triple authentication, and relying upon the case of *Douglass* v. *County of Pike, supra*, well may the bondholders expect of this court a judgment against the city, even if there should be a subsequent decision of the Supreme Court of Ohio, against the constitutionality of such act, and although the personal opinions of the members of this court should be in harmony with that adjudication. In other words, whatever may be thought of the constitutionality of a statute, if it were a new question, there may, by concurrence of legislative, judicial and popular action, become impressed upon bonds issued thereunder an unimpeachable validity. But this is not such a case. While in the matter of structure there is between the act of 1869 and that of 1880 a striking resemblance, there are also marked differences. Even if in form they were absolutely alike, yet, as they are acts respecting dif-

ferent classes of corporations, the validity of the one would
not necessarily determine the validity of the other.   A statute
empowering a county to issue bonds and build a jail might be
unquestionably valid; while a statute, in precisely the same
language, attempting to give the same power to a school dis-
trict, might be as plainly unconstitutional and void.   Here,
the act of 1869 was a grant of power to a city, a "municipal
corporation proper," as Judge Dillon calls it in his work on
Municipal Corporations (volume 1, section 23); while the act
of 1880 was a grant to a township — a "*quasi* corporation,"
as the same author calls it — a distinction recognized in the
State of Ohio long before the passage of even the act of 1869.
*Hamilton County* v. *Mighels*, 7 Ohio St. 109.   The differences
between these two classes of corporations it is unnecessary to
point out in detail.   It is enough to say that one has, far
more than the other, the powers, capacities and duties of a pri-
vate corporation; so that a delegation of power to the one, if
adjudged valid, does not justify the inference that a delegation
of a like power to the other must also be valid.   So far, there-
fore, as judicial determinations are concerned, the purchaser
of these bonds had no express warrant from the Supreme
Court of the State to rely upon.   So far as any mere implica-
tions and inferences from such judicial decisions are concerned,
they were stronger against than in favor of the validity of
these bonds.   The statute of 1872, empowering counties and
townships to issue bonds to build railroads, had been declared
void; and the statute of 1869 had been sustained, as is evident
from the opinion of the Supreme Court, because, as believed,
it was a special exception from the inhibition of the constitu-
tion.   The purchaser of these bonds cannot, therefore, plead
judicial guaranty.   It took the chances, and purchased at its
own peril.   Was the act of 1880 in conflict with the constitu-
tion of Ohio?   The Supreme Court of the State has said that
it was.   37 Ohio St. *supra.*  We are not concluded by that
determination.   In matters of contract, especially, the right
of citizens of different States to litigate in the Federal courts
of the various States, is a right to demand the independent
judgments of those courts.   The settled law in that respect is

well stated in the case of *Burgess* v. *Seligman*, 107 U. S. 20, 33: "Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the State, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the Federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled, it is the right and duty of the Federal courts to exercise their own judgment; as they also always do in reference to the doctrines of commercial law and general jurisprudence. So when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision of the state tribunals, the Federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such cases, for the sake of harmony and to avoid confusion, the Federal courts will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the States in controversies between citizens of different States was to institute independent tribunals which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication."

In this case our judgment accords fully with that of the Supreme Court of the State in 37 and 38 Ohio St. *supra*.

Notice the constitutional provision. The significance of its in-hibition is read in the evil which it was intended to remedy. Common was the practice, theretofore, of issuing municipal bonds to aid in the construction of railroads. The practice was felt to be evil, stimulating unnecessary railroad enter-prises, and injuriously affecting the interests of the taxpayer. The universal method of railroad enterprises was through pri-vate corporations. The possibility of other methods was un-known, or not seriously contemplated. So, when the people by their constitution prohibited public aid to private corporations, obviously the thought was that all public assistance to the build-ing of railroads was prohibited. The ingenuity of the lawyer and the legislator, by means of which the letter of this prohi-bition was avoided, and a city enabled to construct a railroad running from itself to other parts of the country, as a great highway of approach and distribution of its business, was ob-viously not expected or foreseen. We are not criticising the decision in *Walker* v. *Cincinnati*, 21 Ohio St. *supra*, as an erro-neous construction of the constitutional provision. We simply note the fact that the statute therein construed was a skilful avoidance of its generally understood scope. This exceptional character was no nullification of the provision. On the con-trary, the Supreme Court, in its opinion in that case, clearly rec-ognized and stated the force of such prohibition; and, noticing the exceptional character of this legislation, by that very fact indicated that otherwise its force and scope were absolute and wide reaching. It is one thing for a large city, with its con-centration of business interests, to build, equip, and own a great railroad highway running from such centre outward into other districts, rapid and easy communication with which advances its business interests; and it is a very different thing for a *quasi* municipal corporation, like a township, with its sparse population, and its lack of concentration of business interests, to construct a few miles of railroad through its territory. Business may demand the one — convenience alone supports the other. The justification of the one is in the pri-vate and business element which enters into a municipal cor-poration proper; the absence of which element in a *quasi*

corporation, like a township, forbids its investment in railroad enterprises. A railroad is a highway, but its character and mode of use make a large distinction between it and other highways. A few miles of track, unequipped with rolling stock and disconnected from other lines of track, are absolutely worthless. An ordinary highway through a township, although disconnected at either end with other highways, is of practical benefit and substantial use to the people of the township; but it is not so with a railroad track. Only in a lengthened line, with rolling-stock equipment, does a railroad become a thing of value. The act of 1869 contemplated for the city of Cincinnati a lengthened line, with rolling-stock equipment, and made ample provisions therefor. It meant no investment of public funds in a short track to be utilized thereafter by conjunction with other railroads, and made valuable by the infusion of private capital in the ultimate enterprise. It contemplated no mingling of public and private funds in the completed road. This matter was noticed by the Supreme Court of Ohio in its opinion in the Cincinnati case, when, after quoting the constitutional provision, it said: " The mischief which this section interdicts is a business partnership between a municipality or subdivision of the State and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever. In no project originated by individuals, whether associated or otherwise, with a view to gain, are the municipal bodies named permitted to participate in such manner as to incur pecuniary expense or liability. They may neither become stockholders nor furnish money or credit for the benefit of the parties interested therein. Though joint stock companies, corporations and associations only are named, we do not doubt that the reason of the prohibition would render it applicable to the case of a single individual. The evil would be the same, whether the public suffered from the cupidity of a single person, or from that of several persons associated together." 21 Ohio St. 54.

In determining the constitutionality of any statute, its scope and effect are as proper for consideration as its language the

eyes of the court are never limited to the mere letter; and, so construing the act of 1869, the court held that such act contemplated and provided for a completed and continuous line of railroad, which, fully equipped, remained the property of the city, and was a great highway which opened from itself outward into territory whose business would advance the commercial interests of the city. In like manner, when the court came to consider the subsequent legislation with respect to counties and townships, including therein both the legislation of 1872 and that of 1880, it properly considered what must be the effect and operation of the statutes; and it ruled, that obviously under them all that was contemplated was a limited distance of track, whose value could only be secured by mingling the funds of the township with other capital. By the averments in this case, which, under the demurrer must be accepted as true, a private corporation had projected and surveyed a line of road running through several townships; and the significance of these acts, was the securing of the right of way and the grading of the road-bed through these several townships, with the view of thereafter placing this, thus created, continuous line in the possession of some corporation which would equip and operate it. And this combination of statutes, with their several grants of township aid, clearly discloses that there was no thought or possibility of either of the townships building, equipping and owning an independent railroad. Each separate act meant for its township not a railroad, but a road-bed. The practical value, the only real, resulting benefit, was in the incorporation of this road-bed into the railroad projected by, and to be practically operated and made effective only through, private capital. This is not a mere matter of speculation. The descriptions in these various acts of 1880 identify the townships. They are, as alleged in the answer, along in the line of a projected and surveyed railroad. This concurrence of separate township aid, by legislative sanction, establishes an intent to further the projected line through public aid. But this act, with the others, in its particular operation, means not the building and ownership of a railroad, but aid to a projected and lengthy line of railroad.

Such was the conclusion of the Supreme Court of Ohio. We quote its language from 37 Ohio St.: "When viewed in the abstract, it is difficult to see in what manner, within the contemplation of the legislature, the proposed road could become of such public utility as to justify resort to taxation; but when applied to the subject matter, under the existing circumstances the legislative intent becomes quite apparent. Beaver Township, Noble County, the only township to which the provisions of the act were intended to apply, is a sparsely settled agricultural district, with a population of 1684, without railroad facilities either within or bordering upon it. Without railroad connections, it is quite certain that the proposed improvement would be utterly useless; hence, in view of this fact, the trustees of the township designated the location of the proposed road as follows: 'Running through said township from the point that the Somerset railway intersects the east line of said township and terminating where the Belair, Beaver Valley and Shawnee Railway intersects the west line of said township.' Neither of the connecting railways here mentioned is in existence, but only in contemplation, — the former having been authorized to be built by Somerset Township, Belmont County, by an act of the legislature, similar to the one now under consideration, passed on the 18th of March, 1880. So that it is quite evident that the legislative intent, as well as that of the trustees of Beaver Township, was to make the proposed road a link in a more extended route or line of railway. The same intent is manifested in the fact that no provision was made for the operating of the proposed road by the township; but power only was given to lease the same on completion, to any person or persons or company which would conform to the terms and conditions which the trustees should prescribe." 37 Ohio St. 94, 95.

The conclusion of that court was, we think, imperative from the facts as developed. Beyond that, if we ignore all surrounding circumstances, the fact is that the amount of the aid to be voted was insufficient for the construction and equipment of a road of even short length; and, turning to the mere letter of the statute, we notice this significant fact. While

the act of 1869, by its language, contemplated and required a railroad, and thus a highway from Cincinnati outward into territory subservient to its business interests, the act in question before us locates neither the road nor its termini. If the letter of the statute alone be regarded, power is given by this statute to construct a railroad in Alaska. Neither location nor termini are prescribed, and the general power is given to construct a railroad not exceeding seven miles in length. Can an act containing such indefinite provisions, with an appropriation of township aid so limited as to foreclose the idea of a constructed and equipped railroad, and whose thought of mingling public aid with private capital is so evidenced, be one which can be sustained, in the face of the inhibition of the constitution of the State of Ohio? We think not.

*The judgment of the Circuit Court must be reversed, and the case remanded with instructions to overrule the demurrer to the answer.*