In the Matter of the Application of FIORELLO H. LAGUARDIA, etc., Petitioner, to Vacate, Quash or Modify a Certain Subpœna, etc., against ALFRED E. SMITH, JR., and Others, Respondents.*

Supreme Court, Special Term, New York County, March 15, 1941.

*William C. Chanler, Corporation Counsel [Robert H. Schaffer of counsel], for the petitioner.*

*Emil K. Ellis,* for the respondents.

McCOOK, J   The dispute has been simplified by the oral argument.   The subpœna which this application seeks to have vacated or modified calls both for the appearances of the mayor to testify and also for the production by him of the so-called Epstein report and certain correspondence between him and various departments relating to the New York city information center.   Counsel for the special committee of the council investigating the affairs and conduct of the municipal civil service commission disclaims any desire for personal testimony and does not criticize the mayor's motives.   The corporation counsel makes it clear that the mayor does not criticize the council's motives, and that his sole purpose is to resist what he regards as an attempt to encroach by the legislative branch of the city government upon the executive branch.

While, therefore, we perhaps need regard this application as relating only to a limited subpœna *duces tecum*, we are nevertheless asked to determine the broad question " whether the Council may subpœna each and every document in the private files of the Mayor "

*Affd., 262 App. Div. 708.

(main brief, corporation counsel, pp. 8, 9) and the form of the order noticing the motion justifies us in doing so.

Much has been said, in arguing for his immunity from subpœna, of the wide field of the mayor's responsibilities under the City Charter, and of their magnitude. But the question here is not of quantity or variety. The mayor may have powers the President and the Governor lack, and duties in some respects more burdensome. What we have to determine is, rather, the extent of his executive power, express and implied, and of the powers of the council.

As presented here, this controversy depends in part upon the correctness of the mayor's contention that " The New York charter * * * makes the Mayor and Council as independent of each other in their respective spheres as are the chief executive and legislative bodies of the nation and the State." (Main brief, corporation counsel, p. 15.)

The corporation counsel asserts that the separation is as clear in the local field as in the others, illustrating with what he terms a precise parallel by way of provisions in the respective fundamental documents, as he calls them.

| U. S. Const. (Art. II, § 1) | N. Y. State Const. (Art. IV, § 1) | N. Y. City Charter (§ 3) |
|---|---|---|
| " The executive power shall be vested in a President of the United States of America." | " The executive power shall be vested in the governor * * *." | " The mayor shall be the chief executive officer of the city; * * *." |
| (Art. I, § 1) | (Art. III, § 1) | (§ 21) |
| " All legislative powers herein granted shall be vested in a Congress of United States * * *." | " The legislative power of this State shall be vested in the Senate and Assembly." | " The council shall be vested with the legislative power of the city * * *." |

A glance shows that the parallel, even as stated, is not exact. The two Constitutions and the Charter alike vest the legislative power; the Constitutions vest the executive power also; however, the Charter, in the section cited, vests no executive power and instead names the mayor chief executive officer. Is this a distinction without a difference? The question can best be answered by examining the Charter as a whole, with a view to determining where the executive and legislative powers are made to reside.

Chapter 1 of the Charter bears the caption, " Mayor." Its first section (§ 3) is under the subcaption, " Office; election; term;

salary." In addition to the description already given of his office, it contains the provisions appropriate to the subtitle. Section 4 is entitled, " Power of appointment and removal," and the itemized powers which follow are strictly limited; those of appointment by the phrase ' except as otherwise provided by law," while from the officers subject to removal are excepted " officers for whose removal other provision is made by law." No other powers are given to the mayor in this chapter. Under section 8 he may be removed or suspended from office by the Governor.

Chapter 2 relates, nominally, to the council, for such is its title. Section 38, under it, calls for the presentation of every local law or resolution, after its passage, to the mayor for approval, though, notwithstanding his objections, it may be repassed by a two-thirds vote and is then deemed adopted. Section 39 provides that certain types of local laws shall not become effective unless approved by the board of estimate, whereupon they, like local laws, go to the mayor and follow a routine similar to that provided by section 38.

Chapter 3 is headed " Board of Estimate." Under it the membership is described (§ 61) and the number of votes for each member is prescribed, as well as the manner of voting and what constitutes a quorum (§ 62.) The mayor calls the first meeting and presides at all meetings. (§ 65.) By virtue of section 66 there are five bureaus under the board; secretary, franchises, engineering, real estate, and retirement (pensions). Section 70 states that " The board of estimate, subject to this charter, shall exercise all the powers vested in the city except as otherwise provided by law." According to section 71 the board is the head of the New York city employees' retirement system.

Chapter 9, " Capital Budget," gives the board of estimate large control of capital expenditures with important powers in the mayor relating to the maximum.

Chapter 14, " Franchises," must of course be read in connection with chapter 3. Section 362 gives the board of estimate (" except as in this charter otherwise provided ") control of the streets, and exclusive power in behalf of the city to grant franchises or rights to make contracts providing for or involving their occupation and use. Here the mayor's " separate and additional approval " is made necessary to the validity of every resolution. (§ 373.)

Without going further, it is clear that the mayor's executive (as well as administrative) power is shared in certain respects by seven colleagues on a board, over which he presides, all elected at the same time as himself, and two given as many votes as himself. This board performs important directional functions, in at least one of which he must participate affirmatively. " The primary

function of the Board of Estimate, on the other hand, is to direct the business affairs of the city." (Report of the New York City Charter Revision Commission filed with the City Clerk Aug. 17, 1936, p. 7.) It may be that here lies at least one explanation of the failure to vest all executive power in the mayor, corresponding to the power vested in the President and the Governor under the Constitutions of the United States and the State of New York respectively.

Our analysis *pro tanto* of the Charter has tested the claims of complete independence in sphere and function of the executive and legislative branches of the New York city government and of sole executive power in the mayor, and shows they cannot stand. It is an instrument of intermingled, not separate, powers.

When the petitioner presented what he terms the precise parallel between the powers of the executive and legislative heads of the Nation, the State and the city, he refrained from comparing the judicial systems. This is no doubt for the excellent reason that the city has, properly speaking, no judicial system, department or branch of government. The Charter creates none and characterizes one judicial officer alone, of whom it says, " The mayor is a magistrate." (Chap. 1, § 6.)

It seems the Federal authorities have no right to interfere with the States by way of requiring separation of powers as necessary to republican forms or due process of law. The United States Supreme Court said in *Dreyer* v. *Illinois* (187 U. S. 71, at p. 84): " Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, * * * is for the determination of the State."

The State of New York, which possesses the undoubted power of applying such differentiation to its municipalities, has never sought to exercise it, so far as we have been informed.

The power of the Congress of the United States and of the Legislature of the State of New York to issue subpœnas, save only in conflicts between co-ordinate and independent branches of government, has not been questioned.

It is futile to inquire the reasons for the admitted absence of local precedent upon the dispute now before the court. Perhaps, as the respondent hints, no previous mayor has desired to raise the issue. Perhaps, as petitioner hints, previous councilmen and aldermen were more considerate of the mayor

In comparing the needs, duties and rights of executive and legislative officials in the Nation, the State and the city, it seems well to recall briefly the origins of the three governments. First in time came the States, which either took over the Colonial

structure, or adopted entirely new Constitutions by act of their people, usually in convention assembled. The People of these States, acting as the People of the United States, proceeded to create the Federal government by giving it certain express powers, at the same time retaining and reserving all others in the States. The State of New York was one of the colonies which adopted a Constitution immediately, through a convention.

The city of New York is a creature of the State of New York, whose Legislature from time to time has provided a government for the municipality. In later years the powers of this municipal government have, under the Home Rule provisions of the State Constitution, been changed by acts of the State Legislature, which modified and usually increased those powers, and finally embodied them in the first (1897) Greater New York Charter Conceding that the adoption of the principle of home rule has greatly increased local governmental power, it remains true that the Charter, like other State laws affecting New York city, may be at any time changed by the same authority which first conceded it. In short, the Charter of the city is not properly a constitution, like that adopted by the People of the United States for the Nation, and the People of the State of New York for the State. It is a compilation a " complete codification " of the " living law of the City." (Report of Charter Commission, *supra*, p. 5.) Under it the city officials have, as frequently observed, the problems of government with the powers of a municipal corporation, and subject always to legislation by the State.

We, therefore, now turn to the express powers given by the Charter to the council. Section 21 reads: " The council shall be vested with the legislative power of the city, and shall be the local legislative body * * *."

The report of the Charter Revision Commission (*supra*) says (at p. 7): " The Council is the legislative body and is vested with the entire legislative power of the City."

Section 43 of chapter 2 provides: " The council shall have power from time to time to appoint a special committee to investigate any matters relating to the property, affairs or government of the city or of any county within the city. Any such committee shall have power to require the attendance and examine and take the testimony under oath of such persons as it may deem necessary."

Chapter 42 relates to " General Provisions " and under it section 982 reads:

" a. All laws and parts of laws relating to or affecting the city of New York or the municipalities consolidated therein in force when this charter shall take effect are hereby repealed and super-

seded to the extent that the same are inconsistent with the provisions of this charter, and no further.

" b. All other laws and parts of laws shall continue in force until repealed, amended, modified or superseded.

" c. Insofar as the provisions of this charter are the same in terms or in substance and effect as provisions of law in force when this charter shall take effect, relating to or affecting the city of New York, the provisions of this charter are intended to be not a new enactment but a continuation of such provisions of law, and this charter shall be so construed and applied."

Section 54 of the old Charter, after conferring upon the board of aldermen the power (and duty) " to see to the faithful execution of the laws and ordinances of the city," and to appoint a special committee to inquire whether they are being observed by the officers of " any department of the city government " and " generally in respect of any and all matters which will conduce to the orderly and economical administration of the affairs of the city government or any department thereof," says: " Such committee shall have access to the books and records of the city or of any department or officer thereof."

In ordinary circumstances, it might be argued that the omission of express power for such a committee in the appropriate section of the new Charter indicates an intention to deprive it of one of the powers expressly conferred in a corresponding section of the old. But the language of section 982 forbids any such interpretation. Nothing could be more explicit. Certainly there is no inconsistency between the last sentence of old section 54 and the last sentence of new section 43, which includes no limitations as to the " persons " who may be required to attend and testify, and is merely more compact and less explicit than its predecessor.

Since, though the mayor says he does not object to testifying, he challenges by his motion the right and power to compel him to do so, the difference in a sense becomes academic. However, the subject should be pursued long enough to observe that in the face of such language in the two sections it is not helpful to reflect on the composition of the old board of aldermen. As to the functions of the newly constituted local legislature, no doubt it is true as stated by Mr. Tanzer in his book on the City Charter that the commission intended to assign the legislative power to the council. (Report of the Charter Revision Commission, *supra*, p. 7.) But it is begging the question to assume that this in any way limits the power and duty of investigation and inquiry of the council as compared with the board of aldermen.

The principle of inquisitorial power in the council has been upheld recently in *Matter of Herlands* v. *Surpless* (258 App. Div. 275; affd., no opinion, 282 N. Y. 647), where a special committee of that body investigating relief sought to obtain by subpœna records, documents and confidential reports in the possession of the commissioner of investigation. He was conducting under the mayor's instructions an inquiry into the administration of relief. A motion to quash, similar to the present application, was denied, and the court said (at p. 277): "While the council is a local legislative body, in some respects of limited power, it may, where it has jurisdiction, act for the locality precisely as the Legislature may act for the State of New York. (*McCabe* v. *City of New York*, 213 N. Y. 468, 484.) The power to investigate conferred upon the council by section 43 of the charter makes the action of the council in conducting an investigation equivalent to an act of the Legislature."

The sole question, so far as authority is concerned, is whether this principle applies as well to the mayor as to this particular commissioner. Under chapter 34 of the Charter, entitled "Department of Investigation," the commissioner of investigation ("Powers and Duties," § 803):

"1. Shall make any investigation directed by the mayor or the council.

"2. Is authorized and empowered to make any study or investigation which in his opinion may be in the best interests of the city, including but not limited to investigations of the affairs, functions, accounts, methods, personnel or efficiency of any agency."

The subpœna which Commissioner Herlands attacked called not only for reports made by him to the mayor, but also for books and papers of a department (welfare) in his possession. The court required him to turn them over, since otherwise (*Matter of Herlands* v. *Surpless, supra,* p. 279) "a legislative investigation might be thwarted by the action of the department of investigation in instituting its own investigation and seizing all documents available." (Cf. *Matter of Smith* v. *Kern*, 285 N. Y. 632 [LEHMAN, Ch. J., dissenting].)

These principles, this language, apply equally to the mayor in the present situation. The corporation counsel raised similar objections there. The mayor is engaged, it seems, in his own investigation into one of the "agencies" under subdivision (1) of section 5 of the Charter. Subdivision 2 of section 981 defines "agency" as including a "department, division, bureau  *  *  * or agency of government, the expenses of which are paid in whole or in part from the city treasury." The city information center is such an agency.

The report and other documents now in question are private, the mayor contends. In *Matter of Becker* v. *Lunn* (200 App. Div. 178, at p. 181) the court, holding that a mayor could be compelled by mandamus brought by a taxpayer to permit inspection of records and papers in his office under section 51 of the General Municipal Law, said: " We are concerned only with the fact that in his office are certain records relating to such receipts and disbursements. It is not within his province to declare that they are private records. Their quality as such depends not on the will of the mayor or any other person (*Matter of Egan*, 205 N. Y. 147). * * * The policy of the law favors publicity."

*Matter of Egan* (*supra*, at p. 157) held. " * * * a person who sends a communication to a public officer relative to the public business cannot make his communication private and confidential simply by labeling it as such. The law determines its character — not the will of the sender * * *."

It may be, as indicated in the *Egan* case, that the mayor can successfully resist an attempt to obtain from him confidential documents relating to the apprehension and punishment of criminals, or diplomatic correspondence, but no such material is here involved. It appears that even Presidents of the United States, though armed with a protection to which the petitioner is not entitled, were on occasion willing to disclose parts of public documents in their possession which they admitted were not confidential. As Judge LEWIS, of the Court of Appeals, said in the recent case of *Matter of Joint Legislative Committee* (*Teachers Union*) (285 N. Y. 1), where the Teachers' Union sought to quash a subpœna of a State legislative committee: " If a subpœna is to be quashed in advance of a committee hearing, upon a forecast of the testimony sought and arguments as to its probable effect, the purpose of the inquiry may be thwarted."

No doubt an inconsiderate or hostile legislative committee, under this construction of the law, could do much to harass and hamper executives and administrators. It is equally true that, under a different construction, a power-loving mayor with something to conceal might take refuge from a legislative investigation behind the screen of confidence and privacy.

Fortunately, neither situation is present now. Should it happen that, in the future, a council animated by improper motives were so ill advised, using this type of investigation for ulterior purposes, as to interfere with the efficient performance by the city's chief executive officer of his multifarious and arduous duties, the public

which elected and ultimately governs both would know what to do, and has the power to do it. Alternatives such as these are not uncommon under our republican form of democracy, and should not distract the courts from their duty of hewing to the line.

Motion to quash subpœna denied.