OPINION OF THE COURT
Charles A. Kuffner, J.
i. introduction
By order dated October 2, 1985, the Appellate Division, Second Judicial Department, remanded the above matter to *53 this court with a direction that it be referred to a Referee to hear and report concerning the validity of two petitions which seek to place upon the ballot at the next general election a certain referendum to amend the Charter of the City of New York. The nature of the referendum in question as well as the history of this matter to date is set forth in the opinion and order of the Appellate Division (110 AD2d 227), and the opinion and order of this court dated September 6, 1985 (128 Misc 2d 822).
H. THE CHALLENGE TO THE PETITIONS
The Referee has filed her report and the court has confirmed her finding to the effect that the petitions in question are valid.
On October 21, 1985, the parties and the amicus appeared before this court. Because of the expedited nature of these proceedings an oral application to confirm the Referee’s report was made. Petitioners’ main objection was that the report was made on the basis of an extrapolation of the petitions reviewed, to date, and not upon a full line-by-line review of all 35 volumes of petitions containing in excess of 100,000 signatures. The Referee in proceeding as she did and the court in confirming her report were mindful of the decision of the Appellate Division, Second Department, in Matter of Ryan v Sadowski (71 AD2d 938). In that case, the court determined that it was error for Special Term to have terminated a designating petition challenge without full review of all the signatures. Special Term had made its determination utilizing a ratio for the pages not completed to the ratio of valid signatures found on the pages examined.
Significant differences appear, however, in the matter before the court. In Ryan (supra) the petition in question was one designating a candidate for the office of Judge of the Civil Court of the City of New York and was, obviously, much shorter than the one at issue. Implicit within the Ryan decision was the court’s determination that had Special Term proceeded (utilizing Referees) it could, in fact, have completed examination of the petition. The contrary is the case here.
Following the remand of this case from the Appellate Division, this court directed a line-by-line examination of the petitions. Five Referees worked diligently to complete their task. Their work required the Board of Elections offices in five boroughs to remain open late into the evening. Court report *54 ers were required to work overtime as were employees of the Board of Elections, all at great expense to the taxpayers. Notwithstanding these great efforts, it was apparent to the Chief Referee that a line-by-line examination could not be completed by election day let alone at a time before that date sufficient to permit the inevitable appeals to follow this court’s decision. Faced with the option of continuing the examination without regard to the election date or committing even greater judicial and support resources to the effort at hand, with no real expectation of attaining a different result, this court has opted to accept the Referee’s report as submitted. The rule of law is fundamentally one of reason tempered by human experience. To mechanically apply the Ryan case to the situation at bar (as petitioners urge) would be to convert the principle of stare decisis to one of judicial paralysis and would, impermissibly, result in petitioners obtaining by delay that which they failed to achieve by a review of the petitions.
The petitions having withstood judicial scrutiny it is now the duty of this court to pass upon the constitutional objections raised by the petitioners and the amicus.
III. STANDING
Intervenors took the position at oral argument that none of the petitioners have any standing to raise the constitutional issues heretofore raised, since they have never alleged a particularized injury to themselves.
On this issue the court notes that this issue of standing has never been raised by intervenors in their pleadings until they attempted to include it as an affirmative defense in an amended answer dated October 20, 1985 and served October 21, 1985. Several aspects of this entire proceeding were taken to the Appellate Division, Second Department, which remanded the matter back to this court on October 2, 1985. At no time therein did intervenors ever raise the issue of standing. An affirmative defense not pleaded in either a responsive pleading or a timely motion to dismiss is waived (CPLR 3018 [b]; 3211 [e]; De Lisa v Amica Mut. Ins. Co., 59 AD2d 380, 382). The facts underlying this affirmative defense were known, or should have been known, to intervenors at the time they originally answered the petitions and they give no excuse or reason why they should be granted leave to amend at this late stage, when the election is fast approaching.
*55 IV. JUSTICIABILITY
Intervenors also argue that the constitutional issue is not ripe for determination inasmuch as the matter has not yet been placed before the voters. They support their position by stating that any determination of this court as to the constitutionality of the amendment in advance of enactment would be a prohibited advisory opinion and cite Self-Insurer’s Assn. v State Indus. Commn. (224 NY 13) and New York Public Interest Research Group v Carey (42 NY2d 527). The court’s ruling might have a prejudicial effect on the right of the voters to exercise their franchise in a free and unfettered manner. Finally, they aver that the need to determine the constitutionality of the proposal would be rendered moot if the referendum is not approved by the voters.
Whatever the merits of these arguments, the court need not address the issue of ripeness since the law of the case has already been stated by the Appellate Division on October 2, 1985. That court held that the constitutional issue may be determined when the validity of the signatures on the petitions has been decided, and will be ripe if the petitions withstand judicial scrutiny. As stated hereinabove, based on the report of the Referee, the petition has withstood judicial scrutiny and contains a sufficient number of signatures.
V. CONSTITUTIONALITY
It is argued that the proposed referendum conflicts with the authority granted to the Congress (under US Const, art I, § 8) to provide for the common defense of the Nation.
The intervenors contend that the proposed legislation would do no more than "limit the voluntary assistance” of the City of New York in the transferrence of its lands and the use of its moneys in the construction and maintenance of a military facility where nuclear weapons may be located.
Intervenors aver that the proposed referendum is nothing more than an attempt to exercise the police powers of the municipality in a fashion designed to protect its citizens from injury to their lives or health. Such authority has been recognized even in the face of a claim of preemption by Federal legislation or regulation. (See, e.g., De Canas v Bica, 424 US 351 [1976]; Askew v American Waterways Operators, 411 US 325 [1973]; Head v New Mexico Bd., 374 US 424 [1963]; Florida Avocado Growers v Paul, 373 US 132 [1963]; Penn Dairies v Milk Control Commn., 318 US 261 [1943].)
*56 Closely related to the above claim is the question of what effect such a proposed referendum would have should it be adopted and found to be otherwise lawful. As has been previously stated, interveners rely upon a line of decisions of the United States Supreme Court which sustained local regulation of various activities which, arguably, were preempted by Federal action. None of these cases, however, directly address the issue of to what extent such local legislation may be promulgated where its only effect is to place a temporary obstacle in the path of concerted Federal action designed to provide for the common defense of the Nation.
It is the opinion of the court that in the face of such activity by the Congress and the Department of Defense, the City of New York may not legislate, by referendum or otherwise, in such fashion as to hinder the effectuation of national security objectives.
We are one people. The United States Constitution vests in the Federal Government the obligation to provide defense to the entire Nation and all of its people without regard to their location (see, United States v McGee, 432 F Supp 557, 561, affd 611 F2d 375). A necessary correlative to the duty imposed upon the Federal Government is the right it enjoys to make and effectuate decisions respecting the deployment of defense systems, within the United States, unfettered by local regulation designed to impede its efforts.
The proposed referendum is broad in the restrictions it attempts to place upon the, city government. Not only would the city be precluded from the sale or lease of property for the purpose of a military facility or the appropriation or expenditure of funds for the same, but also from the granting of any "franchise, permit, license, use or consent to use, of any city owned property, or street” in conjunction with the development of the military facility in question.
Intervenors concede that the Federal Government might by condemnation take such lands as it may require for its purpose in the City of New York. The breadth of the language of the referendum, however, clearly suggests that apart from the question of land use, a multiplicity of other hindrances would necessarily arise requiring the United States to expend additional time, money and resources in legal or administrative action to accomplish that which is clearly its right and responsibility in the first instance.
Assuming establishment of the installation in question and *57 passage of the referendum, it is apparent that substantial and frequent conflicts concerning the granting of licenses, franchises, permits, etc., would arise. Certainly, the clear potential for such continuing conflict is present. It is precisely friction of this sort that was unacceptable to the court in United States v McGee (supra), and such friction is no more permissible in the instant context.
For substantially the same reasons, the court finds unacceptable the argument advanced by the intervenors to the effect that the referendum restricts only the "voluntary” cooperation of the City of New York in the tranferrence of lands to the Navy.
The intervenors suggested at oral argument that the proposed amendment merely prohibits the Board of Estimate from voluntarily giving any of its property to any facility capable of storing nuclear weapons. This, they claim, makes it a permissible fiscal amendment because it is within the city’s financial interests to obtain the maximum return of money for its real property. They argue that it is not in the city’s best interest to await the Navy to take the property by eminent domain for little or no money, when it can realize a greater monetary return with a different policy.
Assuming, arguendo, that the City of New York has a legitimate interest in obtaining maximum compensation in return for its property, the method chosen by this proposal has no rational relationship toward achieving this interest. The statutes authorizing the Federal Government or its agencies to take the property via eminent domain are not a grant of power to do so without giving just compensation. This is prohibited by the due process clause contained in US Constitution 5th Amendment. The eminent domain laws are consonant with the 5th Amendment inasmuch as they are designed to secure full compensation to the owner (see, United States v Miller, 317 US 369, 373 [1943], reh denied 318 US 798 [1943]; United States v 287.89 Acres of Land, 241 F Supp 464; see also, United States v 101.88 Acres of Land, 616 F2d 762; United States v Certain Lands, 46 F Supp 800).
Since the City of New York will obtain fair and adequate compensation for its property in any event if it were condemned by the Federal Government, the proposal bears no rational relationship to this stated goal. If not approved, the city will nevertheless be entitled to fair and adequate compensation. Thus, the proposal is neither reasonably necessary nor *58 rationally designed to accomplish the otherwise legitimate goal. (20 NY Jur 2d, Constitutional Law, §§ 220-222, and cases cited therein.)
The restrictions sought to be imposed upon the Board of Estimate are so encompassing that the Board would not be permitted to sell or lease the property to the United States Navy even at market value or higher. Thus, interveners’ argument that the referendum, as it pertains to the transfer of land, seeks only to assure that the city receive just compensation for the same is without merit. The clear implication of the language of the referendum is to require the active interference of the city with the efforts of the United States Navy to locate its facility in New York Harbor. At the very least, the likelihood of such an interference is substantial.
Thus, if the purpose of the referendum is purely to obstruct the Federal Government because of local disagreement with national defense policies the local referendum must give way. The referendum, if enacted, could do no more than place the City of New York in an untenable position as against Federal action. The absurdity and injustice that would result thereby, as well as the expense to the people of the City of New York, cannot be presumed by the court as representing the true intention of the framers of the referendum and those voters who support it. The court cannot presume a construction of the referendum that would impute to the electorate a desire to promulgate ultimately meaningless legislation, the attempted enforcement of which would only subject them to further protracted and expensive litigation. (See, McKinney’s Cons Laws of NY, Book 1, Statutes § 152; People ex rel. Westchester Fire Ins. Co. v Davenport, 91 NY 574, 585 [1883].) On the contrary, it is evident that the true intent of the framers of the referendum is to subject the issue of the deployment of nuclear weapons, as part of our national defense to a plebescite at taxpayers’ expense. However sincere the proponents of the referendum may be in seeking to effectuate this intent, it is evident to the court that the petition should be granted and the placing of the referendum upon the ballot enjoined.
VI. THE PROPOSAL AS AN ADVISORY REFERENDUM
In addition to the argument put forth by petitioners that this proposed referendum is an unconstitutional interference with the Federal Government’s obligation to provide for a *59 national defense, they also aver that the referendum is, in fact, advisory in nature, in violation of the law of this State.
The petition proposes to amend New York City Charter §67. That section sets forth the duties and powers of the Board of Estimate. The proposal would add three subdivisions which would, if effective, prohibit the Board from approving any disposition of, or expenditure for any city-owned property so as to facilitate the development of a military facility which is designed to have nuclear weapons.
The enactment of purely advisory resolutions by local municipal bodies of this State, upon petition of the electorate, is proscibed by the Municipal Home Rule Law § 2 (9) (b). (Matter of Silberman v Katz, 54 Misc 2d 956, 959, affd without opn 28 AD2d 992.)
In the absence of an express statutory authority, an advisory referendum by a city is not authorized (Matter of Kupferman v Katz, 41 Misc 2d 124, affd 19 AD2d 824, affd 13 NY2d 932, citing Mills v Sweeney, 219 NY 213, 221). It is clear that the statutes provide no such authority to the City of New York to enact such an advisory local law.
The test to be applied in determining whether or not a proposed charter amendment is purely advisory has been stated in Matter of Astwood v Cohen (291 NY 484, 491): "The test of validity in every case is whether the local law is in truth and in fact an amendment of a city charter” (citing Matter of Maylender v Morrison, 260 App Div 892, affd 284 NY 575; Matter of Steinberg v Meisser, 291 NY 685).
In Astwood (supra), the Court of Appeals addressed the propriety of a proposed local law which was designated as an amendment to the New York City Charter. It purported to amend the charter by providing for the payment of a salary bonus to all police and fire fighters. The court held that since the charter contained nothing with regard to the compensation of police or fire fighters, the proposed referendum in fact amended nothing. The power to fix their compensation was vested in the City Council with the approval df the Board of Estimate and the proposed amendment, if enacted, changed none of those powers. The court made it clear that if the legislative body (i.e., the City Council) could not take action without proper statutory authority, neither could the electorate do so by direct vote.
It must be remembered that the City Charter is a creature of the State Legislature (Municipal Home Rule Law §2 [1]; *60 NY Const, art IX, § 2 [a]; Matter of LaGuardia v Smith, 176 Misc 482, affd 262 App Div 708, affd 288 NY 1; 39 NY Jur, Municipal Corporations, § 107). Accordingly, it may only be amended by the Legislature, which first conceded the charter (39 NY Jur, Municipal Corporations, § 107), or by the people of the city, but only where such amendment is subject to mandatory referendum (Municipal Home Rule Law § 11 [2]). This proposed amendment is not subject to mandatory referendum as defined in Municipal Home Rule Law §23, but is only subject to referendum on petition (Municipal Home Rule Law § 24 [2] [g]) since it changes a provision of law relating to the alienation or leasing of real property of the local government.
The question then, is whether under all the facts and circumstances, this proposed amendment in truth and in fact amends the charter. In any analysis, the court may look beyond the label given to it and consider whether or not it is an amendment in name only (Matter of Astwood v Cohen, supra, at p 488).
On this point, the court notes in passing that the public statements by the proponents of this referendum concern the proposal as an expression of opinion on the placement of nuclear weapons in New York City and not as a revenue raising device. While not conclusive on this issue, it is certainly probative as to the true purpose of this referendum. One court has addressed the problem in the determination of whether a particular referendum was advisory in nature in the face of exclusive Federal interests. In Silberman v Katz (supra), a proposed referendum attempted to create a new municipal office known as the "Anti-Vietnam War Coordinator”. The proposed scope of powers of this office included the right to publicly demand, on behalf of the City of New York, that American troops be withdrawn from Vietnam, to study and report on how money spent on the Vietnam War could be used for local social purposes, to take other appropriate actions to effectuate the withdrawal of United States troops, and to appropriate sums of money from city funds to carry out these purposes.
The court in Silberman (54 Misc 2d 956, supra) analyzed these proposed duties and found that what the proponents really hoped to accomplish was a popular vote on the Federal Government’s policies in Vietnam. The court, in doing so, impliedly permitted an analysis which emphasizes substance over form. The fundamental question addressed by the Kup *61 ferman v Katz case (41 Misc 2d 124, supra), and the Silberman v Katz case (supra), was the propriety of using the municipal electoral process for purposes of obtaining expressions of opinion on matters beyond the effective power of the local body. (Silberman v Katz, supra, at p 960.) That the conduct of this Nation’s defense is beyond the power and authority of the local government to change is a principle which is universally accepted and needs no further elaboration.
It is well settled that the courts are not limited to the mere letter of the law, but may look beyond it and determine its true purpose and effect. (Lochner v New York, 198 US 45 [1905]; Pleasant Township v Aetna Life Ins. Co., 138 US 67, 75-76 [1891].) The courts are not bound by mere form, nor are they to be misled by mere pretenses. As is commonly said, form may not be given precedence over substance.
In determining the purpose of a particular statute, the court may analyze what authority the statute has, in reality to accomplish the end desired. (See generally, Montana Co. v St. Louis Min. & Milling Co., 152 US 160, 170 [1894]; 16 Am Jur 2d, Constitutional Law, § 227; 20 NY Jur 2d, Constitutional Law, § 70.)
This court is thus empowered to look beyond the form which the proposed charter amendment takes and search for the ultimate goal of this proposal.
The proponents of the referendum acknowledged the Navy’s right to take the property at issue by eminent domain. If this is so, what is the purpose of this referendum? The answer in part may be found by a statement of one of the major proponents, the intervener, Thomas DeLuca of the Mobilization for Survival: "It would send a very clear message to City Hall and Washington and throughout the world that the arms race has gone on long enough.” (New York Times, July 3, 1985, p B3, Foes Act to Bar S.I. Naval Base by Referendum.)
Interveners, at oral argument, and in their memorandum of law in opposition to the motion for partial summary judgment dated October 2, 1985, concede that the referendum merely proposes to limit the voluntary assistance of the New York City Board of Estimate in disposing of city-owned parcels of land upon which nuclear weapons might be stored. The memorandum also acknowledges that if it were in effect the Federal Government would be required to expend whatever time, energy and money necessary to condemn the land for its own purposes.
*62 This factor, i.e., that the Federal Government might be required to expend additional time, resources and money to acquire the land to achieve its goal of constructing a homeport if the referendum were enacted, is not to be overlooked. The United States District Court, with the affirmance of the Court of Appeals, Sixth Circuit, has held this issue of greater significance than the issue of whether the local ordinance could in fact be enforced. (United States v McGee, 432 F Supp 557, 560, supra.)
Interveners suggest that the right of the Federal Government to take the property by eminent domain (10 USC § 2663; 40 USC §§257, 258 [superseded by Fed Rules Civ Pro, rule 71A (in 28 USC, Appendix)]) renders the referendum constitutional. They suggest that this right renders the proposal constitutional, or at best, renders the entire constitutional issue moot, because there is no danger of actual and direct interference with the conduct of our defense. However, as was more fully discussed supra, McGee (supra) as well as Stewart & Co. v Sadrakula (309 US 94,103-104 [1940]), and United States v City of Bellevue, (474 F2d 473, 476) suggest that a lesser standard, i.e., a potential for interference or hinderance, may be sufficient to find a constitutional infirmity.
Assuming then, that this referendum were approved by the voters, it would accomplish nothing to prevent the United States Navy from constructing a homeport. It would at most cause the Federal officials to expend time, effort and potential litigation to put the port into operation. While this factor alone is not a basis for finding the proposal to be an impermissible advisory referendum, there is authority to suggest that this result should be avoided, if the real effect is advisory only.
Since the amended charter would effectuate no legal change with regard to the Navy’s right to take under its eminent domain powers, the electoral results for or against the referendum would, for all intents and purposes, be nothing more than a public opinion poll. This is an impermissible purpose for a referendum (see, Matter of Kupferman v Katz, 41 Misc 2d 124, 127, supra; Matter of Silberman v Katz, 54 Misc 2d 956, 962-963, supra; see also, Matter of Citizens for Orderly Energy Policy v County of Suffolk, 90 AD2d 522 [2d Dept]).
One possible effect that this referendum would have on the Navy’s decision to place a homeport on Staten Island is that the Navy will view an approved referendum as an expression of local opinion against the homeport and make another *63 decision (based more on public relations than military strategy) to move it elsewhere. Indeed, it is safe to assume that this is the ultimate purpose of the placement of the referendum on the ballot. The statement by the intervenor DeLuca cited hereinabove is consonant with this assumption. Again, the Astwood, Silberman, Kupferman and Citizens for Orderly Energy Policy line of cases strongly suggest that the use of a referendum to obtain advisory opinion polls is impermissible.
VII. CONCLUSION
The United States Constitution confers the duty of defending our Nation, as a whole, upon the Federal Government. It is perhaps the gravest responsibility of all, for without an unfettered ability to defend ourselves from predatory foreign forces, all other powers conferred upon the Federal Government, as well as all of our cherished rights guaranteed by that same document mean precious little. The common defense was one of the purposes for which the people established the Constitution. (See, United States v Schwimmer, 279 US 644, 650 [1929], overruled on other grounds Girouard v United States, 328 US 61 [1946].) The experience of the Revolutionary War, in which the States were only loosely associated to carry on a unified defense, and of the old Articles of Confederation, in which only limited powers of defense were granted to a central government (art VI, §§ 4, 5; arts VII, VIII, IX, §§ 1, 6) convinced the delegates at the Constitutional Convention of 1787 to create a national government with adequate powers, distinct from those retained by the sovereign States.
This court has a solemn duty to uphold that great plan, and if a State or local law exists which might upset that delicate balance existing between the Federal and State sovereignties, the State or local law must give way. (US Const art VI.)
The powers of the Federal Government to provide a defense and maintain the Armed Forces emanate not from the people of the City of New York alone, but from the people of the United States, whose laws made in pursuance of those powers are declared to be supreme. Only the people of the United States have been entrusted with controlling those measures which affect all. The City of New York alone should not be permitted to compel the Navy to change its decisions when they relate to military strategy, like the tail wagging the proverbial dog. When it attempts to do so by carrying out the intended effect of the referendum, it is attempting to act upon *64 institutions created not by its own constituents, but by a people over whom they claim no control. The test is not the quality of the intentions of the city electorate; the test is one of the extent of their authority under our supreme Constitution. (McCulloch v Maryland, 4 Wheat [17 US] 316, 429 [1819].)
The essence of the issue before the court can be stated in the words of Justice Story who wrote as follows: "It is important also to consider, that the surest means of avoiding war is to be prepared for it in peace * * * How could a readiness for war in time of peace be safely prohibited, unless we could in like manner prohibit the preparations and establishments of every hostile nation? The means of security can be only regulated by the means and the danger of attack * * * It will be in vain to oppose constitutional barriers to the impulse of self-preservation.” (II Story, Commentaries on the Constitution, § 1185 [4th ed 1873].)
Accordingly, it is the judgment of this court that the proposed referendum to amend the Charter of the City of New York is violative of the Constitution of the United States, as well as an impermissible advisory referendum. The petition is granted and the respondent Board of Elections of the City of New York is enjoined from placing the said referendum upon the ballot at the next general election, or if already in place it shall be removed therefrom forthwith.